**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; MARICOPA AUDUBON SOCIETY, | ) ) ) |
|  | ) |
| Petitioners, | ) |
|  | ) |
| v. | ) |
|  | ) |
| RANDY MOORE, *Chief, U.S. Forest Service*; DEB HAALAND, Secretary, *U.S. Department of the Interior*; MARTHA WILLIAMS, *Acting Director, U.S. Fish and Wildlife Service*, | ) ) ) ) ) |
|  | ) |
| Respondents. | ) ) |

---

**PETITION FOR REVIEW OF AGENCY ACTION**

---

1.     This case involves the highly imperiled New Mexico meadow jumping mouse ("jumping mouse") and the species' last tiny, isolated population in the Lincoln National Forest that is facing immediate and permanent extirpation from these federal public lands absent prompt action by this Court.[1]

2.     Pursuant to the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, Petitioners Center for Biological Diversity ("the Center") and Maricopa Audubon Society ("Maricopa Audubon") challenge the U.S. Fish and Wildlife Service's ("FWS") April 20, 2021 biological opinion

---

[1] Although the New Mexico meadow jumping mouse is technically a subspecies, Petitioners refer herein to it as a "species" to avoid confusion.

("2021 BiOp"), and the U.S. Forest Service's ("Forest Service") affirmative actions taken in reliance on the 2021 BiOp, in connection with the Forest Service's continued authorization of extensive livestock grazing in the Lincoln National Forest's Sacramento Allotment.

3.      Since FWS listed the species as endangered in 2014, FWS and the Forest Service ("the agencies") have had numerous opportunities across eight grazing seasons to eliminate livestock grazing or to adopt and implement rigorous measures designed to eliminate or at least minimize impacts to the jumping mouse and its designated critical habitat in the Sacramento Allotment. Instead, the agencies have adopted modest measures such as temporary and permanent exclosure fencing in limited portions of the species' habitat, while watching jumping mouse populations in the Lincoln National Forest all but disappear. Earlier this year, FWS confirmed that the species' status in the Lincoln National Forest has been relegated to one tiny population in the Sacramento Allotment.  And the single surviving, tiny population is divided between two small, unconnected, isolated hog/elk wire fenced exclosures. Without swift action to address the grave effects of livestock grazing, permanent extirpation of the jumping mouse from the Lincoln National Forest is imminent.

4.      Notwithstanding the looming extinction facing the jumping mouse in the Lincoln National Forest—a population that is crucial to the species' ability to survive and recover—the Forest Service, with FWS's authorization, recently approved further livestock grazing in the Sacramento Allotment that is, in effect, a continuation of the failed status quo that is driving this population to extinction. After acknowledging in 2019 that new consultation pursuant to ESA Section 7 was required, the Forest Service waited until 2021 to submit to FWS a biological assessment ("2021 BA") to commence consultation, thereby allowing destructive grazing to occur during the 2020 grazing season without any lawful consultation in place. Even when the

Forest Service finally submitted its 2021 BA, it did so only in response to the Center's 2020 lawsuit, which required the agencies to reinitiate consultation as a condition of settlement. *See* ECF No. 27-1, *Ctr. for Biological Diversity v. Christensen*, No. 1:20-cv-863-WJ-JFR (D.N.M.).

5.      Despite the agencies' renewed opportunity to take actions necessary to avoid the permanent extirpation of the tiny, isolated population of jumping mice in the Lincoln National Forest—such as the elimination of grazing or other measures designed to minimize or eliminate adverse effects to the species and its habitat (including designated critical habitat)—the agencies effectively authorized the same business-as-usual livestock grazing activities with modest modifications that will not take effect for years and even then only if agency funding is available. Yet, without even analyzing whether continued livestock grazing in the interim will jeopardize the species (let alone evaluating the effect to the species if funding never materializes), FWS concluded that continued livestock grazing would neither jeopardize the jumping mouse nor result in the destruction or adverse modification of its critical habitat. In turn, the Forest Service authorized eight more years of livestock grazing—i.e., through the 2028 grazing season—that will occur without any additional ESA consultation.

6.      For these reasons and those set forth below, FWS's 2021 BiOp and the Forest Service's reliance on the 2021 BiOp to discharge its own substantive obligations under the ESA, violate the ESA, its implementing regulations, and the ESA's citizen suit provision. *See* 16 U.S.C. § 1540(g). In addition, the agencies have acted in a manner that is "arbitrary and capricious, an abuse of discretion," "otherwise not in accordance with law," and "without observance of procedure required by law" within the meaning of the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2). Accordingly, the Forest Service and FWS must be immediately enjoined from authorizing any further grazing activities in the Sacramento Allotment until such

3

authorizations can be brought into compliance with the ESA, and the agencies' decisions implementing such activities must be vacated and remanded for further decision-making. 16 U.S.C. § 1540(g); 5 U.S.C. § 706.

## JURISDICTION

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g).

## PARTIES

8.     Petitioner Center for Biological Diversity is a non-profit 501(c)(3) corporation headquartered in Tucson, Arizona, with offices in a number of States and Mexico. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center is actively involved in species and habitat protection issues throughout the United States and the world, including protection of plant and animal species from the impacts of climate change. The Center has more than 81,800 members and more than 1.7 million supporters throughout the United States and the world. The Center brings this action on its own institutional behalf and on behalf of its staff and its members, many of whom regularly enjoy and will continue to enjoy educational, recreational, and scientific activities concerning the jumping mouse and its habitat, including designated critical habitat, harmed by the decisions and actions challenged in this case.

9.     Petitioner Maricopa Audubon Society is a non-profit 501(c)(3) corporation headquartered in Phoenix, Arizona. Maricopa Audubon has approximately 2,000 members dedicated to the study and enjoyment of birds and other wildlife, and to the protection and restoration of habitat in the Southwest. Maricopa Audubon is run by volunteers and strives to protect and restore wildlife habitat through education and community involvement.

4

10.     Petitioners' members use and enjoy the Lincoln National Forest (including the Sacramento Allotment) for a variety of purposes, including hiking, fishing, camping, viewing and photographing scenery and wildlife, and engaging in other vocational, scientific, and recreational activities. Petitioners' members derive scientific, aesthetic, recreational, vocational, and spiritual benefits from the Lincoln National Forest, including the areas and habitat in the Sacramento Allotment where the endangered jumping mouse is found.

11.     Petitioners' members derive health, aesthetic, recreational, inspirational, spiritual, scientific, and educational benefits from their activities within the Lincoln National Forest, including in the Sacramento Allotment. Petitioners' members intend to continue to use and enjoy the Lincoln National Forest frequently and on an ongoing basis in the future, including during the summer and fall of 2021 and in the winter and spring of 2022 when they have concrete plans to return to the affected areas. The areas of the Lincoln National Forest that Petitioners' members intend to continue to use and enjoy include specific areas where the jumping mouse is most likely to be found (i.e., two areas in the Sacramento Allotment).

12.     The health, aesthetic, recreational, inspirational, spiritual, scientific, and educational interests of the Petitioners and their members have been and will continue to be adversely affected and irreparably injured if Respondents' ongoing violations of the ESA and the APA continue. These are actual, concrete injuries caused by Respondents' violations of the ESA and the APA. The relief sought will redress Petitioners' and their members' injuries.

13.     Respondent Randy Moore is the Chief of the Forest Service, an agency within the U.S. Department of Agriculture, and is directly responsible for the supervision, management, and control of the agency. Accordingly, he is responsible for overseeing the Forest Service's actions challenged in this lawsuit. He is sued in his official capacity.

14.     Respondent Deb Haaland is the Secretary of the U.S. Department of the Interior, which is the parent agency of FWS. Accordingly, she is responsible for FWS's actions challenged in this lawsuit. She is sued in her official capacity.

15.     Respondent Martha Williams is the Acting Director of FWS, an agency within the U.S. Department of the Interior, and is directly responsible for the supervision, management, and control of the agency. Accordingly, she is responsible for FWS's actions challenged in this lawsuit. She is sued in her official capacity.

## STATUTORY AND REGULATORY FRAMEWORK

### A.     Endangered Species Act

16.     Recognizing that certain species of plants and animals "have been so depleted in numbers that they are in danger of or threatened with extinction," Congress enacted the ESA to provide both "a means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531. The ESA reflects "an explicit congressional decision to afford first priority to the declared national policy of saving endangered species." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 185 (1978). The ESA "represent[s] the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Id.* at 180.

17.     Under the ESA, a species may be listed as endangered or threatened. An endangered species—a status which is reserved for species in the most perilous condition—is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). As relevant here, the term "'species' includes any subspecies of fish or wildlife or plants . . . ." *Id.* § 1532(16).

18.     Section 9 of the ESA makes it unlawful for any person to "take" an endangered species without express authorization from FWS. 16 U.S.C. § 1538(a)(1). "Take" means, "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The term "harm" is further defined by FWS regulations to encompass habitat modification or degradation that injures an endangered species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. *See* 50 C.F.R. § 17.3. "Harass" is defined as, "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering." *Id.*

19.     Section 7(a)(1) of the ESA directs all federal agencies, in consultation with the Secretary of Interior (through FWS), to "utilize their authorities . . . by carrying out programs for the conservation of endangered species." 16 U.S.C. § 1536(a)(1). "Conservation" means, "the use of all methods and procedures which are necessary to bring any endangered species . . . to the point at which the measures provided pursuant to this chapter are no longer necessary." *Id.* § 1532(3).

20.     Section 7(a)(2) of the ESA further requires all federal agencies to, "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species." 16 U.S.C. § 1536(a)(2). To carry out this obligation, before undertaking any action that may have direct or indirect effects on listed species, an action agency must engage in consultation with FWS in order to evaluate the impact of the proposed action. *See id.* § 1536(a). FWS has defined the term "action" for the purposes of Section 7 broadly to mean, "all activities or programs of any kind authorized, funded, or carried

out, in whole or in part, by Federal agencies," 50 C.F.R. § 402.02, "in which there is discretionary federal involvement or control," *id.* § 402.03.

21.     The primary purpose of consultation is to ensure that the action at issue, "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [designated critical] habitat of such species." 16 U.S.C. § 1536(a)(2). As defined by the ESA's implementing regulations, an action will cause jeopardy to a listed species if it, "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. During consultation, the action agency and FWS must consider not only the impact of the action on the species' survival prospects, but also its effects on the ability of the species to recover. *See Gifford Pinchot Task Force v. FWS*, 387 F.3d 968, 1071 (9th Cir. 2004). The evaluation of the effects of the proposed action on listed species during consultation must use, "the best scientific . . . data available." 16 U.S.C. § 1536(a)(2). The action agency and FWS must also separately ensure that the action will not result in destruction or adverse modification of designated critical habitat, which is defined as, "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." 50 C.F.R. § 402.02.

22.     Consultation under Section 7(a)(2) may be "formal" or "informal" in nature. Informal consultation is "an optional process" consisting of all correspondence between the action agency and FWS, which is designed to assist the action agency, rather than FWS, in determining whether formal consultation is required. *See* 50 C.F.R. § 402.02. During an informal consultation, the action agency requests information from FWS as to whether any listed species may be present in the action area. If listed species may be present, the action agency is required

by Section 7(c) of the ESA to prepare and submit to FWS a "biological assessment" ("BA") that evaluates the potential effects of the action on listed species and critical habitat. As part of the BA, the action agency must make a finding as to whether the proposed action may affect listed species and submit the BA to FWS for review and potential concurrence with its finding. 16 U.S.C. § 1536(c). If the action agency finds that the proposed action, "may affect, but is not likely to adversely affect" any listed species or critical habitat and FWS concurs with this finding, then the consultation process is terminated. 50 C.F.R. § 402.14(b).

23.     On the other hand, if the action agency finds that the proposed action "may affect" listed species or critical habitat by having any potentially adverse effect that is not insignificant or discountable, then formal consultation is required. *See* 50 C.F.R. § 402.11. In that case, following completion of the BA, the action agency must initiate formal consultation through a written request to FWS. *See* 50 C.F.R. § 402.14(c). The result of a formal consultation is the preparation of a biological opinion ("BiOp") by FWS, which is a compilation and analysis of the best available scientific data on the status of the species and how it would be affected by the proposed action. When preparing a BiOp, FWS must: (1) "review all relevant information"; (2) "evaluate the current status of the listed species"; and (3) "evaluate the effects of the action and cumulative effects on the listed species or critical habitat." 50 C.F.R. § 402.14(g). Additionally, a BiOp must include a description of the proposed action, a review of the status of the species and its critical habitat, a discussion of the environmental baseline, and an analysis of the direct and indirect effects of the proposed action and the cumulative effects of reasonably certain future state, tribal, local, and private actions. *Id.*

24.     At the end of the formal consultation process, FWS must determine whether the action—in addition to the pre-existing environmental baseline—will avoid jeopardy (i.e., a no-

jeopardy BiOp) or result in jeopardy (i.e., a jeopardy BiOp). With a no-jeopardy BiOp, FWS determines that the proposed action is not likely to jeopardize the continued existence of listed species or adversely modify critical habitat. If, as part of a no-jeopardy BiOp, FWS determines that the proposed action will nevertheless result in the incidental taking of listed species, then FWS must provide the action agency with a written Incidental Take Statement ("ITS") specifying the, "impact of such incidental taking on the species" and, "any reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact" and setting forth, "the terms and conditions . . . that must be complied with by the [action] agency . . . to implement [those measures]." 16 U.S.C. § 1536(b)(4). Take in excess of the amount authorized by the ITS violates the ESA's prohibition on take. *Id.* § 1538. With a jeopardy BiOp, FWS may offer the action agency reasonable and prudent alternatives to the proposed action (should such alternatives exist) that will not result in jeopardy to a listed species or destruction or adverse modification of critical habitat. *Id.* § 1536(b)(3)(A).

25.     Where a BiOp has been issued and "discretionary Federal involvement or control over the action has been retained or is authorized by law," the action agency is required to reinitiate consultation with FWS in certain circumstances, including: (1) "[i]f new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," or (2) "[i]f the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. § 402.16(a)(2), (3). Additionally, consultation must be reinitiated if, over the course of the action, the amount or extent of incidental take is exceeded. *Id.* § 402.16(a)(1).

26.     The ESA provides that agencies must hold actions in abeyance until any legally required consultation is complete. Section 7(d) of the ESA prohibits an action agency from making, "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" Section 7(a)(2) of the Act. 16 U.S.C. § 1536(d). "This prohibition . . . continues until the requirements of section 7(a)(2) are satisfied." 50 C.F.R. § 402.09. The purpose of this requirement is to ensure that the status quo will be maintained during the consultation process. *See Lane Cnty. Audubon Soc'y v. Jamison*, 958 F.2d 290, 294 (9th Cir.1992) ("In order to maintain the status quo, section 7(d) forbids 'irreversible or irretrievable commitment of resources' during the consultation period").

**B.      Administrative Procedure Act**

27.     The APA, 5 U.S.C. §§ 701-706, provides for judicial review of agency action. Under the APA, the reviewing court must, "hold unlawful and set aside agency action, findings, and conclusions" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). A reviewing court must also set aside agency action, findings, and conclusions found to be without observance of procedure required by law. *Id.* § 706(2)(D).

**FACTUAL BACKGROUND**

**A.      The Jumping Mouse in the Lincoln National Forest**

28.     The jumping mouse is a critically endangered small mammal found exclusively in riparian habitats in the southwestern United States. It is characterized by elongated feet and an extremely long, bicolored tail. The jumping mouse's historical distribution likely included riparian and wetland areas along the Sangre de Cristo Mountains in Colorado and New Mexico,

11

the San Juan Mountains in southern Colorado, the Jemez and Sacramento Mountains in central

and southern New Mexico, the Rio Grande Valley from Española to Bosque del Apache National

Wildlife Refuge in central New Mexico, and the White Mountains in eastern Arizona. However,

extensive habitat loss and fragmentation due to grazing pressure, water management and use,

drought, and wildfire have severely reduced its population and distribution.

29.     On June 20, 2013, FWS proposed listing the jumping mouse as an endangered

species under the ESA. FWS conducted a comprehensive status review of the jumping mouse,

and on May 27, 2014, FWS issued a Species Status Assessment ("2014 SSA"). In this report,

FWS reviewed the jumping mouse's life history, and detailed the threats to the species. As a

result of this review, FWS concluded that the jumping mouse had, "a high probability of

extinction in the near term . . . and a decreasing viability in the long-term" because the remaining

populations "are vulnerable to extirpation." FWS, 2014 SSA at 2.[2]

30.     The jumping mouse requires very specific habitat characteristics to support its life

history needs and is thus considered a habitat specialist. The species requires dense riparian

herbaceous (i.e., non-woody) vegetation composed primarily of sedges (i.e., a marsh plant

related to grasses) and forbs (herbs other than grass, herbs are seed producing non-woody

plants), that averages at least 24 inches in height. To achieve such growth, vegetation must be

associated with seasonally available or perennially flowing water. Accordingly, jumping mouse

habitat must contain sufficient flowing waters and adjacent upland habitat to support the

---

[2] The 2014 SSA is available here:
https://www.fws.gov/southwest/es/newmexico/documents/New%20Mexico%20meadow%20jumping%20mouse%20final%20SSA.pdf

vegetation characteristics necessary to support the species' foraging, breeding, and hibernating behaviors.

31.     Jumping mice are also known to regularly use adjacent upland habitats for dispersal, day nesting, maternal nests, and hibernating. To support movements of individual jumping mice, sufficient habitat—i.e., habitat boasting the tall, dense riparian vegetation essential to the species' life history needs—must extend approximately 330 feet outward from the boundary between the active water channel and the floodplain. The tall, dense plants provide vital cover for nesting, movement, and predation avoidance. Additionally, the riparian vegetation serves as an important food source for the jumping mouse, whose diet consists mainly of grass and forb seeds.

32.     The jumping mouse has a three-year lifespan. The jumping mouse hibernates for eight to nine months out of the year—longer than most mammals. It enters hibernation in September or October and emerges the following May or June. Therefore, it is only active for about three to four months during the summer. Within this short active period, the jumping mouse must breed, give birth and raise young, and feed to store sufficient fat reserves to survive the next long hibernation period. Accordingly, if adequate resources are not available or sufficiently abundant in a particular season, jumping mice populations are greatly impacted and have lower reproductive success and over-winter survival rates during hibernation.

33.     Jumping mice primarily breed in July or August, and produce only a single litter each year, consisting of no more than seven young. This is a small litter size for a rodent. Females care for the young until they are weaned and independent, which typically occurs at four weeks after birth. This is a long rearing period for a rodent, and it is unlikely that juveniles breed

during the same year that they are born. Accordingly, jumping mouse females likely have only two litters in their three-year lifespans.

34.     Because jumping mice have so few offspring each year, every litter is important to the survival and recovery of populations (and the jumping mouse species as a whole). If there are not sufficient resources to support females through the breeding and weaning periods, populations are greatly stressed. The species is thus at a higher risk of extinction because it recovers more slowly from reductions in population size and is subject to genetic and demographic stochasticity (i.e., random fluctuations in population size that occur because the birth and death of each individual is a discrete event).

35.     The jumping mouse has limited dispersal capability and exhibits extreme site fidelity during daily activities. Individual mice typically move less than 330 feet per day and are unlikely to cross areas that do not contain suitable riparian habitat. Gaps of more than 656 feet between suitable habitat areas create significant barriers to movement and decrease the ability for jumping mice to colonize new habitats. Accordingly, ensuring connectivity of suitable habitat along riparian corridors is important both to facilitating daily and seasonal movements, and to ensuring sufficient dispersal and gene flow to support viable and resilient populations of jumping mice. Correspondingly, due to the jumping mouse's life history (e.g., short active period, short life span, low fecundity, low dispersal ability) and specialized habitat requirements, populations have a high potential for extirpation—i.e., local extinction—when habitat is altered, fragmented, degraded, or eliminated.

36.     As explained in FWS's recent update to the species' SSA, the main stressor for the jumping mouse is habitat loss. Indeed, all remaining jumping mouse populations, "likely have insufficient habitat" and face high risks of extirpation. FWS, *Species Status Assessment*

*Report for the New Mexico meadow jumping mouse* ("2020 SSA") at vi. The primary sources of

current and future habitat loss are pressure from livestock grazing, water management and use,

drought, and wildfires. Livestock grazing and poor water management (e.g., water diversion)

result in the loss of the riparian vegetation that the jumping mice need to survive. Likewise,

drought and wildfires alter the composition of the vegetative community. Climate change will

only exacerbate these threats.[3]

      37.     Livestock grazing poses a particularly significant and acute threat to the jumping

mouse. Livestock concentrate in riparian areas due to their productivity and proximity to reliable

water sources, and preferentially graze native riparian vegetation. Grazing eliminates or reduces

the tall herbaceous vegetation and density that the jumping mouse relies upon for its biological

functions and life history needs. Additionally, grazing can alter the composition and structure of

the riparian habitats that are essential to the jumping mouse's survival. By preferentially grazing

native riparian vegetation and thus decreasing competition, grazing can allow for the

introduction and spread of invasive species and can convert sites from riparian vegetation-

dominated to upland plant species-dominated. Additionally, the concentration of livestock in

riparian habitats results in extensive and deleterious trampling, soil compaction, and erosion of

the streambed, which degrades the stream channel such that it can no longer support the riparian

vegetation and wet soils required to maintain suitable habitat for the jumping mouse.  In

addition, the killing of jumping mice by trampling of livestock is not theoretical where at least

---

[3] The 2020 SSA is available here:
https://www.biologicaldiversity.org/species/mammals/pdfs/report-20200130-SPECIES-STATUS-ASSESSMENT-USFWS-20200130_NMMJM-Revised-SSA-Report.pdf .

one endangered jumping mouse "was trampled and killed." Dr. Carol Chambers, *Apache-Sitgreaves and Santa Fe National Forests, Small Mammal Project Annual Report for 2018* at 28.

38.     At the individual level, the removal of vegetation reduces the availability of food resources for jumping mice. If a jumping mouse fails to accumulate sufficient fat reserves during its short active season, it will not survive the long overwinter hibernation. Accordingly, as FWS observed in its 2014 SSA, the jumping mouse is, "extremely sensitive to habitat alterations." 2014 SSA at 89. Unfortunately, the timing of livestock grazing frequently coincides with the jumping mouse's short active season, which reduces the availability of food resources precisely at the time when the jumping mouse needs them to build the fat reserves required to breed, raise young, and enter the next hibernation period. By reducing the availability of food resources, which, in turn, affects overwinter survival, livestock grazing in suitable jumping mouse habitat results in reduced population sizes and, eventually, the extirpation of populations.

39.     The reduction of suitable habitat due to grazing also places individual jumping mice at a greater risk of predation due to the loss of vegetative cover. Jumping mice are highly sought-after food sources, and are prey for many other species, including rattlesnakes, foxes, red-tailed hawks, coyotes, great horned owls, barn owls, and screech owls. Jumping mice depend on tall, dense riparian herbaceous vegetation to provide shelter and cover from predators as they disperse, gather food and nesting material, and breed. By reducing the vertical height of riparian vegetation to a level below that which is required to maintain suitable habitat and cover for the jumping mouse, livestock grazing and trampling within jumping mouse habitat easily degrades the habitat to a condition where the characteristics needed by jumping mouse are no longer available. As a result, jumping mouse populations within grazed areas are at a high risk of extirpation.

40.     At the population level, grazing has repeatedly resulted in the permanent

extirpation of local jumping mouse populations. Indeed, research has shown that the jumping

mouse does not persist in areas that are subject to heavy livestock grazing pressure. The

fragmentation and isolation of mouse populations that results from this lack of habitat

connectivity makes it unlikely that extirpated populations will recolonize these areas in the

future, because there are no nearby, connected populations with robust numbers that can colonize

the extirpated population's habitat.

41.     On June 10, 2014, FWS formally designated the jumping mouse as an endangered

species under the ESA. 79 Fed. Reg. 33,119, 33,137 (June 10, 2014). The designation became

effective on July 10, 2014. *Id.* The ESA defines "endangered species" as a, "species that is in

danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6).

FWS determined in its final listing rule that the jumping mouse meets the definition of an

endangered species primarily because of the present or threatened destruction, modification, or

curtailment of its habitat or range; the inadequacy of existing regulatory mechanisms; and other

natural and manmade factors affecting its continued existence. 79 Fed. Reg. at 33,119. As

explained by FWS in the final listing rule, the remaining small, isolated jumping mouse

populations are particularly threatened with extirpation from habitat loss and modifications. 79

Fed. Reg. at 33,134. The main sources of habitat loss and degradation include grazing pressure

(which removes the needed vegetation), water management and use, loss of water due to drought

(exacerbated by climate change), and wildfires (also exacerbated by climate change). *Id.*

42.     On March 16, 2016, FWS issued a final rule designating critical habitat for the

jumping mouse. *See* 81 Fed. Reg. 14,264 (Mar. 16, 2016). In the rule, FWS identified primary

constituent elements ("PCEs")—i.e., specific elements of physical or biological features that

provide for a species' life history processes and are essential to the conservation of the species—for the jumping mouse. *Id.* at 14,293. The elements that are essential for the conservation of the jumping mouse include: (1) riparian communities along rivers and streams that contain (a) persistent emergent herbaceous wetlands characterized by the presence of forbs and sedges, or (b) scrub-shrub riparian areas; (2) flowing water that provides saturated soils throughout the jumping mouse's active season to support tall (i.e., average height of 24 inches) and dense herbaceous riparian vegetation; (3) sufficient areas of 5.6 to 15 miles along a stream, ditch, or canal that contains suitable or restorable habitat to support habitat connectivity; and (4) adjacent floodplain areas extending approximately 330 feet outward from the water channel. *Id.* FWS identified over 13,000 acres of critical habitat in eight management units containing these PCEs. *Id.* at 14,297-99. However, most of the critical habitat designated by FWS is unoccupied.[4]

43.     Today, the jumping mouse occurs within eight geographic management units that are defined by critical habitat units and occupied habitat. The Forest Service has documented that the jumping mouse has experienced at least an 82% reduction in population due to habitat loss. As of January 2020, the eight geographic management units support 77 small, isolated populations, "[n]early all" of which, "are isolated and widely separated, and . . . are likely within patches of suitable habitat too small to support resilient populations of the jumping mouse." 2020 SSA at iv. In light of this, FWS determined in its 2020 SSA that this species, "likely does not currently have the number and distribution of resilient populations needed to provide the levels of redundancy and representation (genetic and ecological diversity) for the subspecies to demonstrate high viability." *Id.* Indeed, FWS found that the jumping mouse is, "particularly

---

[4] FWS's critical habitat designation for the jumping mouse was upheld by Judge Browning of this Court in a separate challenge by the Northern New Mexico Stockman's Association. *See N. N.M. Stockman's Ass'n v. U.S. Fish & Wildlife Serv.*, 494 F. Supp. 3d 850 (D.N.M. 2020).

vulnerable to extinction," *id.* at 117, "from both random and nonrandom catastrophic natural or human-caused events," *id.* at 121. FWS ultimately concluded that, "that *the subspecies' overall viability is low*, given the ongoing and likely future losses of habitat in conjunction with the small and isolated nature of currently-known populations," because, "the status of the subspecies has been reduced to the point where individual populations are vulnerable to extirpation." *Id.* at 118-19 (emphasis added).

44.     The Sacramento Allotment in the Lincoln National Forest contains parts of two jumping mouse critical habitat subunits: Subunit 4B (the "Upper Peñasco" subunit), which consists of 335 acres along 4 miles of the Rio Peñasco on Forest Service and privately-owned lands; and Subunit 4D (the "Wills Canyon" subunit), which consists of 275 acres along 3.4 miles of streams in the Wills Canyon area on Forest Service and privately-owned lands. *See* 81 Fed. Reg. at 14,302.

45.     In the final rule designating critical habitat for the jumping mouse, FWS observed that although no jumping mice were detected during surveys in 2005, Subunit 4B along the Rio Peñasco in the Sacramento Allotment, "contains perennial flowing water with saturated soils and has a high potential of being restored to suitable habitat." *Id.* FWS further observed that the Rio Peñasco subunit, "would augment the current size and connectivity of suitable habitat to increase the distribution of the jumping mouse in the Sacramento Mountains and provide population redundancy and resiliency." *Id.* FWS thus concluded that, "[a]ll of the areas within [Upper Peñasco] Subunit 4B are considered *essential* to the conservation of the jumping mouse." *Id.* (emphasis added).

46.     With respect to the Wills Canyon subunit, FWS reported that some designated critical habitat areas, "are considered occupied at the time of listing." *Id.* Noting that the

occupied area, "is located on Forest Service lands . . . within the grazing exclosures at Mauldin

Spring," FWS concluded that, "[t]he features essential to the conservation of th[e] []species may

require special management considerations or protection to reduce . . . threats," including

"grazing." *Id.* The remaining unoccupied areas of the Wills Canyon subunit, found both

upstream and downstream of the occupied areas, "are considered *essential* to the conservation of

the jumping mouse." *Id.* (emphasis added).[5]

### B.    The History of ESA Consultation in the Sacramento Allotment

47.    The Sacramento Allotment consists of 111,213 acres of National Forest System

lands in the Lincoln National Forest. Riparian vegetation occurs along seeps, springs, and

perennial streams within the allotment. The allotment consists of a summer and winter range, and

thus is grazed year-round. Both the summer and winter range consist of four pastures each. The

summer range includes four livestock traps (i.e., fenced enclosures that allow for the

concentration and sorting of cattle), whereas the winter range includes one livestock trap. The

Forest Service authorizes up to 412 cow/calf pairs and 5 horses to graze the summer range

between April and October, and up to 335 cow/calf pairs and 5 horses to graze the winter range

between November and May.

48.    By 2004, the allotment's stocking levels were adjusted to current levels of up to

412 cow/calf pairs and 5 horses on the summer range, and up to 335 cow/calf pairs and 5 horses

on the winter range. However, despite the reduction in authorized stocking levels at that time,

---

[5] FWS designated additional critical habitat in the separate Agua Chiquita Allotment within the
Lincoln National Forest. However, the Forest Service's decision to continue grazing in that
allotment and the agencies' Section 7 consultation regarding continued grazing in that allotment
are not at issue in this litigation. Instead, the agencies agreed to reinitiate consultation concerning
grazing in the Agua Chiquita in response to Petitioners' June 4, 2021 notice of intent to sue
under the ESA. If the renewed consultation does not address the legal defects identified in the
Center's notice, the Center will be forced to litigate over those actions as well.

overutilization of the forage by domestic livestock has continued, thereby causing devastating consequences for jumping mouse habitat. For example, in 2010, the forage utilization level in key areas was estimated to be 53%. In 2011, forage utilization in key areas exceeded 76%. Both of these figures far exceeded the then-permitted standard of 45% utilization. This is even more concerning given the fact that the utilization metric itself is only useful as a cattle grazing metric, which is not relevant to, nor capable of, providing for the essential minimum 24-inch height of riparian vegetation required by the jumping mouse.

49.     Although FWS listed the jumping mouse as endangered in July 2014—i.e., more than seven years ago—the Forest Service and FWS's actions to date have never achieved compliance with the ESA, instead allowing significant destruction of jumping mouse habitat and causing substantial take of mice as a result of continued livestock grazing in the Sacramento Allotment.

### 1.     The 2016 and 2018 Biological Opinions

50.     Nearly two years (and one and a half grazing seasons) after FWS listed the jumping mouse as endangered, the Forest Service and FWS initiated formal consultation concerning the Forest Service's ongoing authorization of grazing in the Sacramento Allotment. This consultation process—which did not conclude until yet another grazing season ended without any lawful ESA consultation in place—culminated in an October 20, 2016 biological opinion ("2016 Sacramento BiOp"). The 2016 Sacramento BiOp required the Forest Service to undertake various terms and conditions to protect jumping mice and their habitat, such as installing temporary fencing to exclude livestock from designated critical habitat, frequent monitoring by the Forest Service to ensure compliance by the permittee, and a requirement that the Forest Service immediately notify livestock owners in the event of livestock incursions into

21

fencing exclosures. On the assumption that those terms and conditions would be fully implemented to minimize take of jumping mice and harm to critical habitat, FWS determined that continued grazing would not jeopardize the survival or recovery of the jumping mouse, nor result in destruction or adverse modification of its critical habitat. However, the Forest Service did not in fact implement certain terms and conditions of the 2016 BiOp, which resulted in significant unlawful take of the jumping mouse and destruction of critical habitat.

51.    In January 2018—after an additional grazing season occurred without any effective, lawful safeguards in place to protect the endangered jumping mouse and its critical habitat—FWS requested that the Forest Service reinitiate formal consultation concerning its ongoing authorization of grazing in the Sacramento Allotment, due to the Forest Service's repeated failure to comply with several of the terms and conditions in the 2016 Sacramento BiOp. Although the agencies knew that significant unlawful take was occurring—and thus necessitated reinitiation of consultation—the Forest Service nevertheless continued to allow grazing during the 2018 grazing season while the consultation process took place, in direct violation of Section 7(d) of the ESA. *See* 16 U.S.C. § 1536(d). The reinitiated consultation process culminated in an October 5, 2018 biological opinion ("2018 Sacramento BiOp"), which contained many of the same terms and conditions as the 2016 Sacramento BiOp, such as regular monitoring by the Forest Service and a requirement that the Forest Service immediately notify the permittee in the event of livestock incursions. The 2018 Sacramento BiOp included a few additional conservation measures, such as converting some temporary exclosure fencing to permanent fencing.  Based on those terms and conditions—which, again, in large part mirrored the terms and conditions of the 2016 Sacramento BiOp that the Forest Service repeatedly failed to satisfy, and which thus failed to protect the jumping mouse—FWS once again determined that

continued grazing would not jeopardize the survival or recovery of the species, nor result in destruction or adverse modification of jumping mouse critical habitat.

52.    At the request of the Forest Service, in April 2019 FWS extended the scope of the 2018 Sacramento BiOp to cover the entire term of the Forest Service's grazing permit for the Sacramento Allotment, which expires on February 11, 2029 (i.e., ten additional years of grazing in the 2019-2028 grazing seasons).

53.    In September 2019, the Center notified the Forest Service and FWS that ongoing grazing in the Sacramento Allotment was once again predictably resulting in severe overgrazing, adversely affecting the jumping mouse and its critical habitat in a manner not previously considered in the 2018 Sacramento BiOp, exceeding the level of take authorized in the 2018 Sacramento BiOp, and requiring immediate reinitiation of consultation. As documented extensively in the Center's attached September 2019 ESA notice letter and accompanying photographs, livestock incursions in jumping mouse critical habitat were rampant, *see* 2021 Sacramento BiOp at 76; indeed, "the Forest Service ha[d] reported a high number (more than 100, annually) of unauthorized livestock incursions into exclosures."[6] Yet, despite this significant increase in harm to jumping mice and their habitat beyond what the 2018 Sacramento BiOp authorized or contemplated—and despite an explicit requirement in the 2018 Sacramento BiOp to timely notify the permittee of every incursion—the Forest Service remarkably had not sent a single notification of non-compliance to the permittee. Due to the lack of notice to the permittee, livestock often lingered for days in temporary and permanent exclosures, resulting in a

---

[6] Correspondence, from FWS New Mexico Field Supervisor Shawn Sartorius; to Lincoln National Forest Supervisor Travis G. Moseley (April 20, 202), at page 76.

situation in which the vegetation inside the exclosures looked essentially the same as the completely denuded vegetation outside the exclosures.

54.     In August 2020, after informal negotiations failed and as the Forest Service continued to allow livestock to graze the Sacramento Allotment during a new season (i.e., the 2020 grazing season) without any lawful ESA consultation in place, the Center filed suit in this Court to compel reinitiation of consultation. *See Ctr. for Biological Diversity v. Christiansen*, No. 1:20-cv-863 (D.N.M.). Rather than defend its failure to engage in new consultation for livestock grazing in this allotment, the Forest Service and FWS agreed to settle the case and reinitiate consultation concerning ongoing grazing in the Sacramento Allotment.

### 2.     The 2021 Biological Assessment and the 2021 Biological Opinion

55.     On March 3, 2021, the Forest Service submitted a final biological assessment ("2021 Sacramento BA") to FWS regarding ongoing grazing through the expiration of the grazing permit on February 11, 2029. The Forest Service defined the action under consultation as the continuation of ongoing livestock grazing in the Sacramento Allotment, along with the proposed modification of several conservation measures, terms, and conditions imposed by the 2018 Sacramento BiOp.

56.     In particular, the Forest Service proposed abandoning a conservation measure (and a corresponding term and condition) of the 2018 Sacramento BiOp that utilized a metric requiring less than 20% grazing utilization inside permanent or temporary exclosures within jumping mouse critical habitat (i.e., locations where grazing is generally prohibited), and proposed instead a, "replacement method that would relate to light to moderate livestock grazing intensity." 2021 Sacramento BA at 6. The cursory explanation provided by the Forest Service— which had failed to achieve the 20% maximum grazing utilization levels inside exclosures under

24

the 2016 and 2018 Sacramento BiOps—was that although the prior grazing utilization metric, "is commonly used to assess grazing intensity and inform range management," it is, "less useful in assessing the quality of [jumping mouse] critical habitat." *Id.*; *see also id.* at 21.

57.     Moreover, the Forest Service proposed reducing the frequency of compliance checks for permanent exclosures, despite the routine rate of incursions in prior years. *Id.* at 19. Indeed, "the Forest Service has reported a high number (more than 100, annually) of unauthorized livestock incursions into exclosures."[7] Although the Forest Service once again committed—as it did in 2016 and 2018—to promptly notify the permittee of an incursion into a temporary or permanent exclosure, it did not explain why the Forest Service previously failed to send even a single Notice of Non-Compliance to the permittee, as required by the Forest Service Grazing Permit Administration Handbook, in the face of 162 documented incursions between 2016 and 2020. *See* Forest Service Handbook 2209.13, Chapter 10, Section 16.2

58.     In addition, the Forest Service relied heavily on the fact that in the future it intended to install additional temporary and permanent fencing in certain areas of the Sacramento Allotment. However, the Forest Service explained that such measures would, "depend[] on funds availability." 2021 Sacramento BA at 9. Likewise, the Forest Service conceded that it could only, "sequentially implement [these measures] over a period of years," such that even in the best-case scenario with no funding limitations, these measures would not be completed until at least 2023—i.e., after an additional three seasons of grazing (i.e., the 2021, 2022, and 2023 grazing seasons). *Id.* at 9-11.

---

[7] Correspondence, from USFWS New Mexico Field Supervisor Shawn Sartorius; to: Lincoln National Forest Supervisor Travis G. Moseley; RE: request to reinitiate formal consultation for ongoing livestock management on the Sacramento and Dry Canyon Allotments; April 20, 2021, page 76.

59.     Despite the leisurely pace with which the Forest Service proposed implementing measures to potentially benefit jumping mouse habitat—and even then only if funding is available—the Forest Service acknowledged that, "the only known occurrence[s] of the [jumping mouse] in the Sacramento Ranger District" of the Lincoln National Forest, "are found in the Lower and Upper Mauldin Springs riparian exclosures in Wills Canyon." *Id.* at 30. As a result, the Forest Service explained that, "populations of [the jumping mouse] range-wide on the Sacramento Ranger District *may be trending toward extirpation*." *Id.* (emphasis added). Nevertheless, the Forest Service explained that, as part of its proposed action, "[h]igh livestock use outside of permanent exclosures continues to fragment habitat for the [jumping mouse]," including in designated critical habitat. *Id.* at 38. Because unfenced critical habitat will be actively grazed under the Forest Service's ongoing authorization of grazing in the Sacramento Allotment, the Forest Service committed to managing these areas with, "the goal to meet 35% utilization levels." *Id.*

### 3.     *The 2021 Biological Opinion*

60.     On April 20, 2021, FWS issued the 2021 Sacramento BiOp. Despite FWS's ultimate conclusion that the proposed action would neither jeopardize the species' survival or recovery prospects nor destroy or adversely modify the species' critical habitat, the agency explained the extremely precarious situation facing the jumping mouse across its range and, in particular, the one tiny remaining population of jumping mice remaining in the Lincoln National Forest on the Sacramento Allotment.

61.     For example, FWS explained that, "[t]he New Mexico meadow jumping mouse needs to have multiple resilient populations distributed throughout different drainages within the eight geographic management areas to have high viability." 2021 Sacramento BiOp at 25. Yet,

26

FWS noted that, "the distribution and abundance of the jumping mouse has declined significantly range-wide." *Id.* at 26; *see also id.* at 49 ("Documented populations are likely remnants of a much larger historical distribution that included other scattered locations, none of which contain extant populations."). In fact, "[t]he majority of extirpations have occurred since the late 1980s to early 1990s, as we found about 70 historically occupied locations are now considered extirpated." *Id.* at 26. FWS explained that although researchers have identified 77 remaining populations spread across eight conservation areas in three states, "some populations may already be extirpated," "[n]early all of the current populations are isolated and widely separated," and, "*all* of the 77 populations have patches of suitable habitat that are too small to support resilient populations of jumping mice." *Id.*

62.     With respect to livestock grazing, FWS explained in the 2021 Sacramento BiOp that, "[l]ivestock have frequently made unauthorized incursions into exclosures (temporary and permanent) to varying degrees, impacting jumping mouse habitat suitability." *Id.* at 49. As a result of "poor grazing management," "the livestock traps and Upper Rio Peñasco exclosure in this critical habitat subunit do not contain suitable jumping mouse habitat, as the areas lack sufficient vegetation height and structure to fully support PCEs for the mouse." *Id.* Likewise, FWS explained that it is, "likely that habitat fragmentation has led to poor survivorship conditions in the majority of Wills Canyon and it is not known whether the jumping mouse persists downstream of the riparian exclosures." *Id.*

63.     FWS further explained that, "[t]he jumping mouse has been confined to two isolated localities within the Sacramento Allotment: Cox Canyon in the middle Rio Peñasco, and Mauldin Spring in Wills Canyon." *Id.* "This restriction of extant jumping mice to two locations within the action area is likely the result of combination of factors including poor grazing

27

management," because, "[g]razing practices have historically resulted in overutilization of riparian and upland resources across the Sacramento Allotment [] which has altered many ecosystem functions and processes." *Id.* Importantly, FWS noted that "[c]urrent grazing practices"—which the Forest Service seeks to continue until at least 2029 when the current permit expires—"have *not* resulted in habitat improvement across the allotment, as evidenced by the continual exceedance in grazing criteria reported over the past few years." *Id.* (emphasis added).

64.     When combined with water use, drought, climate change, and recreation effects, livestock grazing has, "fragmented mouse habitat, reduced forage availability in riparian areas and adjacent uplands, and inhibited natural ecosystem functions and processes." *Id.* at 50. "These impacts have caused adverse effects to jumping mice by reducing the number of extant populations, inhibiting population connectivity and dispersal, and potentially increasing adverse genetic effects to populations that persist in the action area." *Id.*

65.     In assessing, "the consequences of ongoing grazing management on the jumping mouse," FWS stressed that, "[d]egradation of stream and riparian areas has caused these types of habitats to become highly fragmented, which is the separation of extensive habitats into smaller, isolated patches, or completely lost and, as a result, caused populations of jumping mice to become isolated." *Id.* at 69. "This isolation is evident by the substantial decline of jumping mouse survey detections that have been occurring over time in previously occupied habitat within the action area." *Id.* As a result, FWS determined that, "[b]ecause habitat fragmentation has isolated jumping mice populations, remaining extant populations *are now at high risk* to stochastic [random] and catastrophic events and a reduction in genetic diversity, reducing jumping mouse population resilience." *Id.* at 70 (emphasis added). "Fragmented habitat also

28

causes a lack of connectivity between patches of suitable habitat, inhibiting mice from completing long-distance movements or dispersal into new habitat areas and therefore limiting or preventing the establishment of new populations." *Id.* Hence, FWS explained that, "[b]ecause jumping mouse habitat is fragmented and isolated, long-term conservation of the jumping mouse requires more than just the maintenance of status quo for the rivers"; "[i]t requires restoring the system to the point where floodplains rebuild with fine-soiled banks and terraces, which provide habitat for dense riparian vegetation, and the base-flow channel narrows with steeply sloping or overhanging banks." *Id.* FWS further noted that, "[t]he primary causal factors to the impairment of stream channels and riparian areas within the action area is historic and continued grazing and, to a lesser degree, recreation activities that occur in these areas." *Id.*

66.     Importantly, FWS determined that, "[t]he streams in Upper Rio Peñasco Canyon and Wills Canyon *are extremely important and are a crucial part in the survival and recovery of the jumping mouse.*" *Id.* After explaining the myriad ways in which ongoing livestock grazing harms the jumping mouse and its habitat (including designated critical habitat), FWS explained that, "[a]ny effect that eliminates or greatly reduces reproduction or survival would severely deplete recruitment and persistence of jumping mice within the action area." *Id.*

67.     Turning to the species' habitat, FWS explained that the Forest Service's longstanding use of a 40-45% forage utilization standard outside of jumping mouse critical habitat and its use of a 35% forage utilization standard within jumping mouse critical habitat located outside exclosures is, "detrimental to sustaining functional jumping mouse habitat and populations outside of exclosures because grazing to this use level reduces the availability of forage, increases risk of predation by removing vegetative cover, alters riparian habitat conditions through streambank trampling, soil compaction, and modification of vegetative

29

communities, and alters microclimates from moist habitats to mesic or xeric habitats." *Id.* at 71.

"As these changes to jumping mouse habitat occur, jumping mouse riparian and upland habitat

become non-functional and unable to support mouse populations." *Id.*

68.     With respect to the limited areas containing permanent exclosures where livestock

grazing is prohibited, FWS pointed out that, "[m]aintenance of these exclosures has been an

ongoing challenge for the Forest Service and livestock incursion into exclosures is common

within the action area . . . with this unauthorized grazing negatively affecting the herbaceous

component within the exclosures and removing PCEs necessary to support functional jumping

mouse habitat." *Id.* at 71-72. FWS noted that several temporary exclosures had been

discontinued in 2019, which, "will expose jumping mouse critical habitat to livestock grazing

that will reduce or eliminate PCEs necessary to support jumping mouse critical habitat," and

explained the resulting, "[l]oss of critical habitat will directly impact jumping mice in these areas

through reduced forage availability, increased risk to predation and harassment, and decreased

ability to disperse to more suitable critical habitat." *Id.* at 72. FWS explained that "by the end of

2023"—i.e., after three more grazing seasons—it is expected that an additional 94 acres of

jumping mouse critical habitat will be protected by new temporary or permanent fencing. *Id.*

69.     FWS summarized that the, "35 percent utilization standards within most upland

habitat . . . is not likely to provide suitable habitat" and that, "[t]his level of grazing will likely

result in additional habitat loss and/or fragmentation, loss of food resources during the mouse's

active season, or inadequate residual vegetation being available after jumping mice emerge from

hibernation." *Id.* "Upgrading the fencing on several existing riparian exclosures and installing

new permanent exclosures will assist in the maintenance and restoration of jumping mouse

30

habitat within these exclosures but jumping mouse habitat will still be limited or non-existent outside of these areas due to grazing." *Id.*

70.     In reviewing the effects of the proposed action on the species' critical habitat, FWS explained that once all fencing is installed by the end of 2023 (assuming the Forest Service obtains funding), 233 acres of critical habitat in the Sacramento Allotment will be within exclosures (i.e., 138 acres in permanent fencing and 95 acres in temporary fencing), while 325 acres of critical habitat in the allotment will remain completely unprotected by fencing. *Id.* at 75. Rather than acknowledge that the proposed action will leave 58% of critical habitat in this allotment entirely exposed to unfettered livestock grazing—and an additional 17% of critical habitat in this allotment will be within temporary fencing that has been documented to regularly fail to prevent livestock incursions—FWS instead asserted that the unfenced portion of critical habitat in this allotment is only 2% of, "the total amount of designated critical habitat for the species range wide." *Id.* At the same time, FWS explained that continued livestock use of areas, "outside of permanent exclosures . . . will continue to inhibit the attainment of PCEs I, II and III thereby preventing the development of suitable riparian habitat to support jumping mouse populations." *Id.* Thus, FWS concluded that "the livestock impacts to critical habitat described above, will disproportionately affect jumping mice because these areas will serve as barriers to the species dispersal." *Id.*

71.     With respect to the chronic problem of, "unauthorized livestock incursions into exclosures," FWS noted that, "[s]ince 2016, the Forest Service has reported a high number (more than 100, annually) of [livestock incursions]." *Id.* at 76. "Incursions by livestock into areas that are temporarily fenced using electric fencing are likely to be substantially higher than exclosures with permanent fencing." *Id.* Yet, despite the Forest Service's repeated failure to monitor for

incursions and timely notify the permittee to remove livestock from exclosures, FWS noted that

the Forest Service once again proposed regular (weekly) inspections and to promptly notify the

permittee within 24 hours to remove the livestock. *Id.* Despite finding that, "[u]nprotected

critical habitat (420 acres) will be adversely affected by livestock trampling, the loss of

protective cover from livestock use, and a reduction in the amount of food available to jumping

mice," FWS concluded that, "these [e]ffects are not anticipated to appreciably reduce the

function of designated critical habitat within Critical Habitat Unit 4 because these areas on the

. . . allotment (subunits 4b and 4d) are relatively small (453 acres) as compared to all designated

critical habitat within Unit 4 (1,924 acres)." *Id.* at 77. Accordingly, FWS "determine[d] that the

proposed action, if implemented as described, will not reduce the critical habitat unit's

functionality to support recovery of the jumping mouse or impede the unit's ability to contribute

to the recovery of the species within the watershed." *Id.*

72.    Importantly, FWS made clear that its assessment and ultimate conclusion

concerning critical habitat were contingent on the assurance that, "the Forest Service is initiating

long-term conservation measures . . . to ensure protection of riparian habitats and watersheds that

will assist in the survival and recovery of the jumping mouse." *Id.* "*Without these measures*, *the

survival and recovery of the jumping mouse would be in greater peril in these allotments*." *Id.*

(emphasis added). "*Once the proposed actions and conservation measures are fully

implemented*, they will limit trampling of streambanks and alteration of dense herbaceous

riparian vegetation in approximately 233 acres (94 hectares) of designated critical habitat within

exclosures, allowing PCEs for jumping mice to reestablish or persist, and generally manage

livestock in such a way as to allow riparian areas to make progress towards meeting proper

functioning condition." *Id.* Despite the fact that these measures will not be completed until at

least the end of 2023 and only then pending the availability of funding, FWS did not contemplate (let alone analyze) the foreseeable effects to critical habitat that will occur *before* such measures can be completed.

73.     Despite FWS's finding that, "the survival and recovery of the jumping mouse would be in greater peril" until various conservation measures are undertaken that are at least three grazing seasons from completion, *id.*, FWS ultimately concluded that the proposed action, "is not likely to jeopardize the continued existence of the endangered New Mexico meadow jumping mouse nor is it likely to destroy or adversely modify its critical habitat." *Id.* at 100. In reaching this conclusion, FWS focused heavily on: (1) the fact that only 2% of the species' total critical habitat, including both occupied and unoccupied habitat, would be impacted by the proposed action; (2) the Forest Service's proposed conservation measures, which would not be completed at the earliest before the end of the 2023; and (3) the Forest Service's commitment to regularly monitor exclosures and timely notify the permittee of any incursions. *Id.*; *see also id.* at 106 ("[FWS] based this determination on the small amount of habitat that would be temporarily impacted and because we expect that connectivity will be improved through livestock management and new fencing.").

74.     However, FWS did not evaluate whether the loss of this exceptionally important critical habitat—which supports the last remaining surviving jumping mouse population in the Lincoln National Forest—constitutes destruction or adverse modification of critical habitat at the overall critical habitat level, the watershed level, the unit level, or the subunit level. Nor did FWS evaluate whether the tiny surviving jumping mouse population is likely to be extirpated before the fencing measures are completed in late 2023 (assuming funding availability), let alone address whether the loss of this population would constitute jeopardy by impairing the species'

survival or recovery prospects. Nor, for that matter, did FWS explain how it could logically base its conclusions on the Forest Service's commitment to regularly monitor exclosures and timely notify the permittee of incursions, when FWS had before it years of information and data documenting the Forest Service's (and the permittee's) repeated, chronic failure to comply with essentially the same requirements under the 2016 and 2018 Sacramento BiOps.

75.     In addition, although the Forest Service's 2021 Sacramento BA proposed to abandon the longstanding grazing utilization metrics in favor of a more subjective metric of assessing impacts to jumping mouse critical habitat, FWS based the ITS for the proposed action on the grazing utilization metrics previously applied to this allotment in the 2018 Sacramento BiOp—i.e., a maximum 20% grazing utilization within permanent exclosures, and a maximum 35% grazing utilization for jumping mouse critical habitat outside permanent exclosures. *Id.* at 105-06. If those metrics are exceeded during the Forest Service's inspections of the jumping mouse's habitat, the Forest Service and FWS must reinitiate consultation. *Id.* However, FWS failed to explain how continuing to utilize a 35% grazing utilization standard *outside* of exclosures will avoid jeopardy, let alone destruction or adverse modification of critical habitat, when FWS concluded that the 35% utilization metric was insufficient to support the species' life cycle needs and the PCEs necessary for critical habitat to adequately serve as suitable jumping mouse habitat.

**C.      The 2021 Grazing Season and the Center's ESA Notice Letter**

76.     On the basis of FWS's 2021 Sacramento BiOp, the Forest Service is actively authorizing grazing in the Sacramento Allotment, including in jumping mouse critical habitat, using a 35% grazing utilization standard that FWS itself concluded is, "detrimental to sustaining functional jumping mouse habitat and populations outside of exclosures." *Id.* at 71. Even within

34

permanent exclosures, FWS's allowance of up to 20% grazing utilization recognizes that even permanent exclosures cannot fully eliminate harm to jumping mice and their habitat.

77.     On June 4, 2021, weeks after FWS issued its 2021 Sacramento BiOp, Petitioners submitted a detailed notice of intent to sue to the agencies for myriad legal violations in connection with the 2021 Sacramento BiOp, which Petitioners attach. Although the parties engaged in informal discussions to ascertain whether they could find a mutually agreeable resolution that would not involve the Court, the agencies refused to reinitiate ESA consultation to address the serious legal deficiencies identified in the Center's ESA notice letter, nor would the Forest Service commit to temporarily suspending the grazing permit pending completion of a legally required ESA consultation process as required by Section 7(d) of the Act, 16 U.S.C. § 1536(d).

78.     On information and belief, livestock grazing in the Sacramento Allotment during the current grazing season is causing significant, devastating damage to vegetation in jumping mouse habitat (including designated critical habitat), which is functionally indistinguishable from the poor condition of this habitat that existed under the 2016 and 2018 Sacramento BiOps. Because the agencies agreed in the 2021 Sacramento BiOp only to adopt extremely modest modifications to the terms and conditions of the prior unlawful biological opinions, it was entirely predictable that substantial habitat degradation of this magnitude would result, inflicting further harm on this species that is trending toward extinction in the Lincoln National Forest.

79.     The following is an image of healthy jumping mouse habitat from FWS's website,

https://www.fws.gov/southwest/es/NewMexico/NMMJM.cfm :



Healthy jumping mouse habitat.
*Photo Courtesy of the USFWS*"

80.     The following is an image of health jumping mouse habitat from the Forest

Service's website: https://www.fs.usda.gov/detail/r3/home/?cid=stelprd3809040 :



"This image of critical habitat on the Santa Fe National Forest displays the tall herbaceous
riparian vegetation and adjacent intact upland habitat that is essential to the species."
*Photo Courtesy of the U.S. Forest Service*"

81.     In contrast, Petitioners provide several representative photographs of jumping

mouse critical habitat in the Sacramento Allotment taken in July 2021, close in time to the filing

of this lawsuit (and after Petitioners submitted their ESA notice letter to the agencies):



Sacramento Allotment - Wills Canyon Critical Habitat denuded vegetation inside fenced exclosure. 32º 48.046' N 105º 44.1536' W, July 26, 2021. ©Robin Silver.



Sacramento Allotment - Rio Penasco habitat exclosure with inadequately recovering streamside Critical Habitat in background. 32º 49.7091' N 105º 45.9204' W, July 27, 2021. ©Robin Silver.



Sacramento Allotment - unprotected stream changing course through grazed grass outside lower Mauldin Springs exclosure. 32º 47.7863' N 105º44.7049' W, July 26, 2021. ©Robin Silver.



Sacramento Allotment – Wills Canyon exclosure illegal livestock incursion on right just below lower Mauldin exclosure. 32º 47.9543' N 105º44.5634' W, July 26, 2021. ©Robin Silver.



Sacramento Allotment - Wills Canyon exclosure illegal livestock incursion violation. 32º
48.3557' N 105º43.7877' W, July 26, 2021. ©Robin Silver.

82.     On information and belief, rather than suspend grazing in the Sacramento

Allotment in response to the alarming condition of jumping mouse habitat and in order to avoid

further violations of the ESA, the Forest Service has instead recommended that the permittee

agree to a modest reduction in the number of cattle for the remainder of the summer grazing

season. However, even if the permittee agrees to this recommendation, it nevertheless fails to

address the fact that significant ongoing livestock grazing will foreseeably lead to substantial

degradation of jumping mouse habitat (including designated critical habitat) both within and

outside exclosures, in violation of the ESA.

83.     Despite the agencies' explicit duties to avoid jeopardy and to avoid destruction or

adverse modification of critical habitat, the Forest Service and FWS have allowed significant

livestock grazing for eight seasons since FWS protected this species as endangered, all the while

without any lawful BiOp (or lawful ITS) in place that contains sufficient terms and conditions to avoid jeopardy or adverse modification of critical habitat. As a result, the agencies have stood idly by as this species hurtles towards extinction in the Lincoln National Forest, in express violation of the ESA's mandates, for no other reason but to avoid burdening an uncooperative livestock permittee with lawfully required restrictions that are necessary to ensure survival and recovery of the jumping mouse. It is far past time that the agencies be held accountable for their repeated failures to comply with the ESA; this is likely the last chance for the jumping mouse to sustain any viable population in the Lincoln National Forest.

## PETITIONERS' CLAIMS FOR RELIEF

### Claim 1 – FWS's Violations of the ESA and APA
### in Issuing the 2021 Sacramento BiOp

84.     Petitioners hereby incorporate all preceding paragraphs by reference.

85.     By determining that the proposed action will not jeopardize the jumping mouse's survival or recovery prospects, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

86.     By determining that the proposed action will not destroy or adversely modify the jumping mouse's designated critical habitat, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

87.     In issuing the 2021 Sacramento BiOp—including its conclusion that the proposed action will not jeopardize the jumping mouse's survival or recovery prospects, or destroy or adversely modify designated critical habitat—FWS failed to rely on the best available scientific evidence, and thus violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

88.     By skewing the proposed action for consultation to exclude any interim consideration of the action's effects prior to full completion of all purportedly beneficial measures, and by failing to address the effects that will result from the proposed action until all proposed conservation measures can be implemented (including whether those effects will result in jeopardy or destruction or adverse modification of critical habitat), FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

89.     By adopting grazing utilization metrics that FWS recognizes will cause substantial harm to jumping mice and significantly degrade their habitat (including critical habitat), combined with the Forest Service's serious, chronic failure to achieve these utilization standards in the past (which FWS failed to analyze, including for purposes of jeopardy and destruction or adverse modification of critical habitat), FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

90.     By assuming without explanation that the Forest Service will conduct routine exclosure monitoring and promptly notify the permittee of any incursions as a basis for FWS's conclusions that the proposed action will not result in jeopardy or destruction or adverse modification of critical habitat—despite years of evidence demonstrating the ineffectual nature of this approach—FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

91.     By issuing an ITS that adopts an arbitrary surrogate for determining when the authorized level of jumping mouse take has been exceeded, which requires only sporadic monitoring by the Forest Service, which is based on a metric for evaluating livestock grazing use

42

rather than jumping mouse habitat suitability, and which is not sufficient to avoid substantial

harm to jumping mice and their habitat within and outside exclosures, FWS violated Section

7(a)(2) of the ESA, its implementing regulations, and acted arbitrarily and capriciously in

violation of the APA, 5 U.S.C. § 706(2).

92.     By failing even to consider (let alone determine) whether the baseline condition of

the jumping mouse across its range, in this management unit, and in the Lincoln National Forest

is currently jeopardized prior to the implementation of the proposed action that will only worsen

its condition at every scale, FWS violated Section 7(a)(2) of the ESA, its implementing

regulations, and acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

93.     By failing to evaluate whether the small, isolated population of jumping mice in

the Sacramento Allotment will be extirpated during the course of the proposed action, including

before any purported benefits may begin to accrue to the species after all conservation measures

are implemented, FWS violated Section 7(a)(2) of the ESA, its implementing regulations, and

acted arbitrarily and capriciously in violation of the APA, 5 U.S.C. § 706(2).

94.     By failing to explain major inconsistencies between FWS's no-jeopardy

conclusion in the 2021 Sacramento BiOp and FWS's own findings in its 2020 SSA regarding the

species' low viability in the long term due to precisely the kinds of local extirpations of

important populations at issue in the Sacramento Allotment, FWS violated Section 7(a)(2) of the

ESA, its implementing regulations, and acted arbitrarily and capriciously in violation of the

APA, 5 U.S.C. § 706(2).

95.     For myriad reasons described herein, FWS has itself failed to ensure against

jeopardy of the jumping mouse and to safeguard against destruction or adverse modification of

critical habitat for the species, in violation of Section 7(a)(2) of the ESA, its implementing

regulations, and the APA, 5 U.S.C. § 706(2).

**Claim 2 – The Forest Service's Violations of Sections 7(a)(2) and 7(d) of the ESA**

96.     Petitioners hereby incorporate all preceding paragraphs by reference.

97.     By continuing to authorize livestock grazing in the Sacramento Allotment, the

Forest Service has failed to ensure that its actions will not jeopardize the jumping mouse's

survival or recovery, in violation of Section 7(a)(2) of the ESA and its implementing regulations.

98.     By continuing to authorize livestock grazing in the Sacramento Allotment, the

Forest Service has failed to ensure that its actions will not destroy or adversely modify the

jumping mouse's critical habitat, in violation of Section 7(a)(2) of the ESA and its implementing

regulations.

99.     To the extent the Forest Service relies on FWS's 2021 Sacramento BiOp, that

consultation document is fatally flawed for the reasons explained herein and cannot and does not

relieve the Forest Service of its independent duties to avoid jeopardy and destruction or adverse

modification of critical habitat, thereby resulting in ongoing violation of Section 7(a)(2) of the

ESA and its implementing regulations.

100.    By providing inaccurate information to FWS regarding the Forest Service's

ability to satisfy the terms and conditions of the 2021 Sacramento BiOp (and the 2021

Sacramento BA)—despite years of failing to satisfy functionally identical terms and conditions

of prior biological opinions—the Forest Service is violating Section 7(a)(2) of the ESA and its

implementing regulations.

101.    By failing to consult with FWS in a manner that satisfies the Forest Service's

substantive duties under the ESA—which means that further consultation is legally required—

the Forest Service's continued authorization of livestock grazing in the Sacramento Allotment, which lacks lawful approval under the ESA absent further consultation, is in ongoing violation of Section 7(d) of the ESA, 16 U.S.C. § 1536(d).

### Claim 3 – The Forest Service's Violations of Section 7(a)(1) of the ESA

102.    Petitioners hereby incorporate all preceding paragraphs by reference.

103.    By failing to implement a program that conserves the highly endangered jumping mouse (by, for example, ensuring permanent protection of all designated critical habitat in the Sacramento Allotment from livestock incursions), and instead continuing to authorize grazing season after season in a manner that knowingly and significantly impairs the jumping mouse's habitat (including critical habitat) and subverts the jumping mouse's prospects for survival and recovery, the Forest Service is in ongoing violation of its affirmative obligation to "carry[] out programs for the conservation" of listed species, 16 U.S.C. § 1536(a)(1), in violation of Section 7(a)(1) of the Act.

### Claim 4 – The Forest Service's Violations of Section 9 of the ESA

104.    Petitioners hereby incorporate all preceding paragraphs by reference.

105.    By authorizing significant livestock grazing in the Sacramento Allotment without a legally sufficient BiOp or ITS in place, and because the level of take is foreseeably exceeding the amount of take authorized by the ITS contained in the 2021 Sacramento BiOp, the Forest Service is in ongoing violation of Section 9 of the ESA and its implementing regulations.

## PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that the Court enter an Order:

1.      Declaring that Respondents have violated the Endangered Species Act and the Administrative Procedure Act;

2.       Enjoining the Forest Service from authorizing grazing in New Mexico meadow jumping mouse habitat in the Sacramento Allotment until formal consultation under Section 7(a)(2) of the ESA has been reinitiated and completed;

3.      Setting aside the 2021 Sacramento BiOp—and the grazing permit that relies upon the unlawful 2021 Sacramento BiOp—and ordering the Forest Service and FWS to reinitiate formal consultation under Section 7(a)(2) of the ESA to address all of the impacts of the Forest Service's actions on the New Mexico meadow jumping mouse and its critical habitat prior to authorizing any further grazing activities in the Sacramento Allotment;

4.      Ordering the Forest Service—in consultation with FWS—to develop, by a reasonable date certain, an appropriate conservation program pursuant to Section 7(a)(1) of the ESA that utilizes the Forest Service's authorities to conserve the New Mexico meadow jumping mouse and its critical habitat in the Lincoln National Forest, and enjoining and/or setting aside the Forest Service's grazing permit for the Sacramento Allotment until such conservation program is finalized;

5.      Awarding Petitioners their attorneys' fees and costs in this action; and

6.      Granting Petitioners any further relief as the Court may deem just and proper.

Respectfully submitted,

*/S/ DOUGLAS W. WOLF*
DOUGLAS W. WOLF
NM Bar No. 7473
3191 La Avenida de San Marcos
Santa Fe, NM 87507
Phone: (703) 994-1309
dwwolf@aol.com

*/S/ WILLIAM S. EUBANKS II*
WILLIAM S. EUBANKS II
DC Bar No. 987036 (in good standing)
*(Association of Attorney Licensed Outside the*
*District forthcoming)*
EUBANKS & ASSOCIATES, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
Phone: (970) 703-6060
bill@eubankslegal.com

*/S/ ELIZABETH L. LEWIS*
ELIZABETH L. LEWIS
DC Bar No. 229702 (in good standing)
*(Association of Attorney Licensed Outside the*
*District forthcoming)*
EUBANKS & ASSOCIATES, PLLC
1331 H Street NW, Suite 902
Washington, DC 20005
Phone: (202) 618-1007
lizzie@eubankslegal.com

*Counsel for Petitioners*