CENTER *for* BIOLOGICAL DIVERSITY                                          *Because life is good.*

VIA CERTIFIED MAIL AND E-MAIL

September 13, 2019

David Bernhardt, Secretary of the Interior
U.S. Dept. of the Interior
1849 C Street, N.W.
Washington D.C.  20240
exsec@ios.doi.gov

Margaret Everson, Principal Deputy Director
Exercising Authority of the Director
U.S. Fish and Wildlife Service
1849 C Street, N.W.
Washington D.C.  20240
Margaret_Everson@fws.gov

Amy Lueders, Regional Director
U.S. Fish and Wildlife Service
P.O. Box 1306
Albuquerque, NM  87102
RDLueders@fws.gov

Vicki Christiansen, Acting Chief
U.S. Forest Service
201 14th St., S.W.
Washington D.C.  20024
vcchristiansen@fs.fed.us

Cal Joyner, Regional Forester
U.S. Forest Service, Southwest Region
333 Broadway SE
Albuquerque, NM  87102
cjoyner@fs.fed.us

Travis Moseley, Forest Supervisor
Lincoln National Forest
3463 las Palomas Road
Alamogordo, NM 88310
tmoseley@fs.fed.us

Dear Messrs. Bernhardt, Joyner, and Moseley, and Mses. Everson, Lueders, and Christiansen,

**RE:   Sixty-Day Notice of Endangered Species Act Violations, Lincoln National Forest**

The U.S. Secretary of the Interior ("Secretary"), U.S. Fish and Wildlife Service ("FWS"), and U.S. Forest Service ("Forest Service") are hereby notified that the Center for Biological Diversity and Maricopa Audubon Society intend to file suit, pursuant to the citizen suit provision of the Endangered Species Act ("ESA"), 16 U.S.C. § 1540(g), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, to (1) compel the reinitiation of ESA Section 7 consultations for the Agua Chiquita and Sacramento Allotments, to (2) to enjoin further adverse modification of Critical Habitat on these allotments and on the Silver Springs Creek Critical Habitat Unit; (3) to enjoin excessive Incidental Take of the New Mexico Meadow Jumping Mouse ("NMMJM") on the Agua Chiquita and Sacramento Allotments, and (4) to compel the Forest Service to obey its "duty to conserve" NMMJM on the Lincoln National Forest.

This Notice presents significant new information for the Sacramento Allotment and the Aqua Chiquita Allotment including (1) the amount and extent of anticipated incidental take of NMMJM has been and is being exceeded, (2) that the effects of these agency actions are affecting endangered NMMJM and its designated Critical Habitat in a manner and to an extent not considered in the

Biological Opinion and Letter of Concurrence for these two allotments, (3) that the authorized cattle grazing is being dramatically modified in a manner that is causing effects to NMMJM and designated Critical Habitat that was not considered, (4) that the Forest Service is disregarding its obligation to carry a program to conserve NMMJM, (5) and that there has been and is ongoing unauthorized taking, or harming of NMMJM in direct violation of take anticipated and approved by FWS.  In addition, we document adverse modification of Critical Habitat in the Silver Springs Creek Critical Habitat Unit.

Specifically we challenge (1) FWS' April 28, 2017, Concurrence for the Agua Chiquita Allotment, FWS' October 14, 2017, Concurrence for the Bounds Allotment, and FWS' October 5, 2018, Biological Opinion for the Sacramento Allotment; (2) the Forest Service's unlawful reliance on FWS' April 28, 2017, Concurrence for the Agua Chiquita Allotment, and FWS' October 5, 2018, Biological Opinion for the Sacramento Allotment; (3) the failure of FWS and the Forest Service to reinitiate ESA Section 7 consultation on the ongoing implementation of Agua Chiquita Allotment and Sacramento Allotment cattle grazing; (4) the Forest Service's failure to carry out a conservation program for the NMMJM on the Lincoln  National Forest; (5) the exceeding of Incidental Take on the Sacramento and Agua Chiquita allotments; (6) the destruction and adversely modification of NMMJM Critical Habitat in the Silver  Springs Creek, Upper Peñasco, Middle Peñasco, Wills Canyon/Mauldin Springs, and Agua Chiquita  Creek Critical Habitat Units; (7) the cattle grazing actions have been modified in a manner that is destroying Critical Habitat not considered and anticipated; and (8) the jeopardizing of the continued existence of the jumping mouse.  The Secretary, FWS, and the Forest Service have sixty days to remedy the violations identified herein.

## EXECUTIVE SUMMARY

The New Mexico Meadow Jumping Mouse ("NMMJM") represents the health of upper elevation meadows and streams.  NMMJM is endangered because of the destruction of these upper elevation meadows and streams upon which NMMJM requires for survival.  Survival and recovery of NMMJM requires protection and recovery of these upper elevation meadows and streams now designated as Critical Habitat.

The Ninth Circuit Court of Appeals succinctly summarizes the purpose of Critical Habitat:

"…the purpose of establishing "critical habitat" is for the government to carve out territory that is not only necessary for the species' survival but also essential for the species' recovery."[1]

In designating Critical Habitat for NMMJM, U.S. Fish and Wildlife Service stated (***emphasis added***),

"We found five of the eight geographic management areas would have sufficient populations to support species viability if the current jumping mouse areas were expanded to provide for resilient populations. The three exceptions where the historic distribution is not adequately represented by recently located populations were in the Jemez Mountains, the Sacramento Mountains, and the Rio Grande geographic management areas. ***We found***

---

[1] 16 U.S.C. § 1533(f)(1); GIFFORD PINCHOT TASK FORCE, et al., v. UNITED STATES FISH & WILDLIFE SERVICE, No. 03-35279; U.S. Court of Appeals for the Ninth Circuit, *378 F.3d 1059*; *2004 U.S. App. LEXIS 16215*; *59 ERC (BNA) 1110*; *34 ELR 20068,* June 7, 2004, Argued and Submitted, Seattle, Washington, August 6, 2004, Filed.

*that the conservation of the subspecies requires increasing the number and distribution of populations of the jumping mouse to allow for the restoration of new populations and expansion of current populations into areas that were historically occupied within the Jemez Mountains, Sacramento Mountains, and the middle Rio Grande*."[2]

The situation for NMMJM in the Sacramento Mountains on the Lincoln National Forest is dire. In "Lincoln National Forest Jumping Mouse Annual Report for 2017," Dr. Carol Chambers reports,

"Because we had so few detections of jumping mice on the LNF [Lincoln National Forest], we did not live-trap or radio collar animals to avoid risk to individuals."[3]

Five areas in the Sacramento Mountains have been designated as Critical Habitat ("CH"). These areas are Silver Springs: Silver Springs Creek ("4A"), Upper Peñasco: Rio Peñasco "(4B"), Middle Peñasco: Rio Peñasco ("4B"), Wills Canyon: Mauldin Springs ("4D"), and Agua Chiquita Canyon: Agua Chiquita Creek ("4E").[4]

This correspondence documents flagrant and systemic disregard by Forest Service officials and by grazing permittees for NMMJM and for the health of the irreplaceable, upper elevation, public lands' meadows and streams in the Sacramento Mountains that NMMJM CH represents. Cattle grazing has moderately to severely damaged the meadows and streams of Upper Peñasco, Middle Peñasco, Wills Canyon and Agua Chiquita CH units. Silver Springs CH has been mildly to moderately degraded by stray horses. As a result, the critically endangered New Mexico Meadow Jumping Mouse faces increasing jeopardy and faces decreasing chances of recovery as it experiences destruction and adverse modification of its federally designated Critical Habitat.

On April 28, 2017, FWS issued its concurrence for the Forest Service's "April 3, 2017, request for informal consultation for the Agua Chiquita Allotment Ongoing Grazing Activities, Sacramento Ranger District" and where the Forest Service (1) "requests concurrence with a determination that the proposed action 'may affect, is not likely to adversely affect' the December 16, 2015, Biological Assessment that Aqua Chiquita Allotment cattle grazing (1) "may affect, is not likely to adversely affect" NMMJM, and (2) "request[s] concurrence with a determination that the proposed action 'may affect, is not likely to adversely affect' designated critical habitat for the jumping mouse…'" and "that the proposed action is 'not likely to adversely modify' proposed critical habitat …" [5] FWS concluded in its April 28, 2017, Concurrence,

"Based on information contained within the BA, we find that your proposed action will have insignificant and discountable effects to the jumping mouse…and [its] designated critical habitat …"

---

[2] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse; Final Rule; Federal Register, Volume 81, Number 51, March 16, 2016, page 14296.

[3] "Lincoln National Forest Jumping Mouse Annual Report for 2017," FS Agreement No.: 17-CR-11031000-003; Reporting Period: January – December 2017; Project Title: New Mexico meadow jumping mouse habitat and diet on the Lincoln National Forest; Carol L. Chambers, undated.

[4] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse; Final Rule; Federal Register, Volume 81, Number 51, March 16, 2016, page 14298, 14321.

[5] Correspondence, from Susan S. Millsap, Field Supervisor, U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office, Albuquerque; to Elizabeth A. Humphrey, District Ranger, Sacramento Ranger District, Lincoln National Forest; RE: Cons. #02ENNM00-2017-I-0439, Request for Informal Consultation for the Agua Chiquita Grazing Allotment; April 28, 2017.

FWS concluded that Agua Chiquita Allotment cattle grazing along Agua Chiquita Creek, and the Agua Chiquita Critical Habitat Unit, "will have insignificant and discountable effects" based, in part, on Forest Service promises "to maintain riparian exclosures," to "prevent grazing in riparian areas along Agua Chiquita Creek," that "no livestock grazing will take place in the riparian pasture," to "perform compliance checks regularly through the grazing season to ensure that no livestock are within riparian areas," to "perform compliance checks regularly throughout the grazing season to ensure that now livestock are within riparian areas," and "will notify the permittee and the livestock will be removed within 72 hours of official notification accompanied by necessary repairs to fencing."[6] In addition, the April 28, 2017, Concurrence states that "[g]razing …will be managed through herding … water developments, and drift and electric fences to prevent livestock from grazing riparian areas along Agua Chiquita Creek.  The District will exclude jumping mouse habitat in Agua Chiquita Canyon with permanent and temporary barbed wire and electric fencing.  The Forest Service will upgrade all temporary electric fencing from a single strand to two strands…"[7]

In this Notice, we record observations and present documentation that the promises made by the Lincoln NF in order to secure FWS' April 28, 2017, Concurrence on Agua Chiquita Allotment cattle grazing are being grossly disregarded.

Previously, on January 6, 2016, FWS offered a joint concurrence on the Agua Chiquita Allotment and the Bounds Allotment.  For the Bounds Allotment, which grazes the Middle Rio Peñasco Critical Habitat Unit, the Lincoln National Forest produced a Biological Assessment, dated September 17, 2017.  The September 17, 2017, Bounds Allotment Biological Assessment states that "Current Grazing Management…Authorize dormant season grazing between October and March…for up to 20% utilization in NMMJM habitat."[8]  The January 26, 2018, Bounds Allotment Annual Operating Instructions confirms this restriction on grazing within the Middle Rio Penasco Critical Habitat Unit to only the dormant season.[9]  The October 4, 2017, FWS' Concurrence[10] on the Bounds Allotment perpetuates the January 6, 2016, Concurrence.

In this Notice, we record observations and present documentation that the promises made by the Lincoln National Forest in order to secure FWS' October 4, 2017, concurrence on Bounds Allotment cattle grazing are being violated.

On October 5, 2018, FWS issued its Biological Opinion on Sacramento Allotment grazing along Upper Rio Peñasco and Wills Canyon/Mauldin Springs Critical Habitat Units that (1) "the action, as proposed, is not likely to jeopardize the continued existence of the endangered New Mexico meadow jumping mouse"; (2) "that the effects are not likely to destroy or adversely modify designated critical habitat," and "the Service does not expect the effects of the proposed action to impede the survival or recovery of the jumping mouse."[11]

---

[6] Ibid.

[7] Ibid.

[8] Bounds Allotment Ongoing Grazing Activities New Mexico Meadow Jumping Mouse Biological Assessment Sacramento Ranger District, Lincoln National Forest Service, September 17, 2017.

[9] Bounds Allotment – 2018/2019 Annual Operating Instructions, Sacramento Ranger District, January 26, 2018.

[10] Correspondence, from Susan Millsap, Field Supervisor, U.S. Fish and Wildlife Service new Mexico Ecological Services Field Office, Albuquerque, NM: to Elizabeth A. Humphrey, District Ranger, Sacramento Ranger District; RE: Concurrence of a "may affect, not likely to adversely affect" determination for New Mexico Meadow Jumping Mouse and Critical Habitat; October 4, 2017.

[11] Correspondence, from: Susan S. Millsap, Field Supervisor, U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office, Albuquerque, NM; to: Travis G. Mosely, Forest Supervisor, Lincoln National Forest, Alamogordo,

For the Sacramento Allotment, FWS concluded "not likely to jeopardize" and "not likely to destroy or adversely modify designated critical habitat" based on Forest Service promises to "perform compliance checks," "monitor key species utilization," "contact permittee the permittee within 24 hours of their discovery…[i]f livestock gain entry into exclosures," ensure that exclosures and other fences are functional and maintained," "minimize utilization of grazing allotment forage to less than 20% with these exclosures," and "assess conditions…throughout each grazing season."

In this Notice, we present evidence the promises made by the Lincoln NF in order to secure FWS' October 5, 2018, Biological Opinion on Sacramento Allotment cattle grazing are being grossly disregarded.

The Forest Service and FWS are in violation of the ESA for at least the following reasons:

(1) FWS violated the ESA and APA in preparing and issuing the April 28, 2017, Letter of Concurrence for the Agua Chiquita allotment and the October 5, 2018, Biological Opinion for the Sacramento allotment, 16 U.S.C. § 1536, 5 U.S.C. §§ 701-706;

(2) the Forest Service is in ongoing violation Section 7 of the ESA in continuing to rely on the unlawful April 28, 2017, Letter of Concurrence for the Agua Chiquita allotment and the October 5, 2018, Biological Opinion for the Sacramento allotment, 16 U.S.C. § 1536(a)(2);

(3) FWS and the Forest Service have violated and are in ongoing violation of the ESA for failing to reinitiate Section 7 consultation, even though the anticipated amount and extent of incidental taking of jumping mouse has been exceeded, despite new information revealing effects of the action that are affecting the jumping mouse and its Critical Habitat in a manner and to an extent not previously considered in the April 28, 2017, Concurrence for the Agua Chiquita allotment and the October 5, 2018, Biological Opinion for the Sacramento allotment, and even though the action has been modified in a manner that is causing effects to the jumping mouse and its critical habitat that were not considered in the April 28, 2017, Concurrence for the Agua Chiquita allotment and the October 5, 2018, Biological Opinion for the Sacramento allotment, 16 U.S.C. § 1536(a)(2), 50 C.F.R. 402.16;

(4) the Forest Service has violated and is in ongoing violation of Section 7(a)(1) of the ESA, where "all" federal agencies "shall, in consultation with and with the assistance of the [FWS], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered and threatened species," as the Forest Service is jeopardizing the continued existence of the jumping mouse and allowing the continued destruction and adverse modification if its critical habitat, 16 U.S.C. § 1536(a)(1);

(5) the Forest Service is authorizing and allowing the destruction and adverse modification of Critical Habitat for the jumping mouse, and jeopardizing the continued existence of the species, in violation of Section 7 of the ESA, 16 U.S.C. § 1536(a)(2); and

(6) FWS has failed to prepare a Recovery Plan, in violation of ESA 16 U.S.C. § 1533(f).

Under the current circumstances, compliance with the ESA requires, at a minimum:

---

NM; RE: Cons. #02ENNM00-2016-F-0440-R001, Biological Opinion for Ongoing Livestock Management on the Sacramento and Dry Canyon Allotments; October 5, 2018.

(1) all cows are immediately removed from and prevented from further access into designated Critical Habitat for the jumping mouse;

(2) the Forest Service promptly embarks on all necessary habitat restoration and rehabilitation activities to ensure that damaged Critical Habitat recovers and that NMMJM recovery is no longer thwarted; and

(3) the Forest Service and FWS immediately reinitiate consultations on the Agua Chiquita and Sacramento allotments, and FWS prepare new or revised Biological Opinions that fully comply with the ESA for both allotments.

## FACTUAL BACKGROUND

On June 10, 2014, the New Mexico meadow jumping mouse ("jumping mouse") was listed as endangered by FWS.[12]  The listing rule states,

> "Our assessment concluded that the New Mexico meadow jumping mouse has an overall low viability (probability of persistence) in the near term (between now and the next 10 years) and a decreasing viability in the longterm future (beyond 10 years). [Page 33120] …

> The New Mexico meadow jumping mouse has exceptionally specialized habitat requirements to support these life-history needs and maintain adequate population sizes. Habitat requirements are characterized by tall (averaging at least 61 centimeters (cm) (24 inches (in)), dense riparian herbaceous vegetation (plants with no woody tissue) primarily composed of sedges (plants in the Cyperaceae Family that superficially resemble grasses but usually have triangular stems) and forbs (broad-leafed herbaceous plants). This suitable habitat is found only when wetland vegetation achieves full growth potential associated with perennial flowing water. This vegetation is an important resource need for the New Mexico meadow jumping mouse because it provides vital food sources (insects and seeds), as well as the structural material for building day nests that are used for shelter from predators. [Pages 33120-1] …

> Since 2005, researchers have documented 29 remaining populations spread across the 8 geographic management areas (2 in Colorado, 15 in New Mexico, and 12 in Arizona). Nearly all of the current populations are isolated and widely separated, and all of the 29 populations located since 2005 have patches of suitable habitat that are too small to support resilient populations of New Mexico meadow jumping mouse. [Page 33121] …

> Considering the subspecies' biological status now and its likely status into the future, without active conservation (i.e., grazing management and water management) existing populations are vulnerable to extirpation (at least 11 have already undergone substantial impacts since 2011) and, therefore, the subspecies as a whole is currently at an elevated risk of extinction. None of the 29 populations known to exist since 2005 are of sufficient size to be resilient. Assuming this rate of population loss continues similar to recent years, the number of populations could be severely curtailed in the near term,

---

[12] Determination of Endangered Status for the New Mexico Meadow Jumping Mouse Throughout Its Range, Final Rule, U.S. Fish and Wildlife Service, 79 Fed. Reg. 33119, June 10, 2014.

eliminating the level of redundancy needed to withstand catastrophic drought and wildfire, along with the additive impacts of multiple threats. In addition to past sources of habitat loss, ongoing grazing, water shortages, and high-impact wildfire (the latter two exacerbated by climate change) will continue to put all of the remaining locations at considerable risk of extirpation in the near-term (between now and the next 10 years) and increasing over the long term." [Page 33122]

On April 28, 2017, FWS issued its Letter of Concurrence for the Aqua Chiquita allotment with the Forest Service's April 3, 2017, request for (1) "concurrence with a determination that the proposed action 'may affect, is not likely to adversely affect,'" NMMJM, and (2) "that the proposed action 'may affect, is not likely to adversely affect' designated critical habitat for the jumping mouse."[13]

FWS concluded in its April 28, 2017, Concurrence,

"Based on information contained within the BA, we find that your proposed action will have insignificant and discountable effects to the jumping mouse...and [its] critical habitat."

FWS based its April 28, 2017, Agua Chiquita Allotment concurrence on [***emphasis added***]:

"The Service concurs with your determination for the following reasons: ...

• The *Forest Service will continue to maintain riparian exclosures in occupied and designated critical habitat*.

• <u>Livestock will be managed by herding, salting, mineral supplementation, water developments, and drift fencing to disperse livestock on the allotment and prevent grazing in riparian areas along Agua Chiquita Creek</u>.

• *Fencing and water developments will prevent grazing of upland and riparian vegetation within occupied jumping mouse habitat and designated critical habitat*.

• *No livestock grazing will take place in the riparian pasture*. ...

• <u>The Forest Service will perform compliance checks regularly throughout the grazing season to ensure that no livestock are within riparian areas</u>. ...

• *If livestock are found within riparian areas, the Forest Service will notify the permittee and the livestock will be removed within 72 hours of official notification accompanied by necessary repairs to fencing*. ..."[14]

In addition, the April 28, 2017, Concurrence states,

"Grazing will not exceed 35 percent utilization in either pasture and will be managed through herding, salting, mineral supplementation, water developments, and drift and electric fences to prevent livestock from grazing riparian areas along Agua Chiquita Creek. The District will exclude jumping mouse habitat in Agua Chiquita Canyon with permanent and temporary barbed wire and electric fencing. The Forest Service will

---

[13] Correspondence, from Susan S. Millsap, Field Supervisor, U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office, Albuquerque; to Elizabeth A. Humphrey, District Ranger, Sacramento Ranger District, Lincoln National Forest; RE: Cons. #02ENNM00-2017-I-0439, Request for Informal Consultation for the Agua Chiquita Grazing Allotment; April 28, 2017.

[14] Ibid.

7

upgrade all temporary electric fencing from a single strand to two strands and increase the solar boxes to a higher voltage than boxes used in 2016."[15]

FWS summarizes its April 28, 2017, Concurrence' reliance on these Forest Service promises:

"Based on this information, we concur that the proposed action for the Agua Chiquita Allotment "may affect, is not likely to adversely affect" the … New Mexico meadow jumping mouse, or [its] designated critical habitat … The effects associated with allotment management for the Agua Chiquita Allotment were determined to be insignificant or discountable to the species and their critical habitat … , as well as beneficial to the recovery of habitat for the jumping mouse."[16]

As we record and document below, in the NMMJM Agua Chiquita Critical Habitat Unit, the Forest Service has

(1) failed to maintain riparian exclosures in occupied and designated critical habitat,

(2) failed to prevent grazing in riparian areas along Agua Chiquita Creek,

(3) failed to keep its promise that fencing and water developments will prevent grazing of upland and riparian vegetation within occupied jumping mouse habitat and designated critical habitat,

(4) failed to keep its promise that no livestock grazing will take place in the riparian pasture,

(5) failed to perform compliance checks regularly to ensure that no livestock are within riparian areas or we would not have been able to observe and document such widespread destructive impacts, and,

(6) failed to keep its promise that livestock will be removed within 72 hours of official notification accompanied by necessary repairs to fencing or we would not have been able to observe and document such widespread destructive impacts.

On October 5, 2018, FWS concludes in its Biological Opinion on the Sacramento Allotment that (1) "the action, as proposed, is not likely to jeopardize the continued existence of the endangered New Mexico meadow jumping mouse"; (2) "that the effects are not likely to destroy or adversely modify designated critical habitat," and "the Service does not expect the effects of the proposed action to impede the survival or recovery of the jumping mouse."[17]

FWS based its October 5, 2018, Biological Opinion, on the following reasons (***emphasis added***):

"1. ***The Service anticipates a relatively small amount of low to moderate quality jumping mouse habitat and PCEs will be impacted by the proposed action*** through water gaps and trailing.

---

[15] Ibid.

[16] Ibid.

[17] Correspondence, from: Susan S. Millsap, Field Supervisor, U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office, Albuquerque, NM; to: Travis G. Mosely, Forest Supervisor, Lincoln National Forest, Alamogordo, NM; RE: Cons. #02ENNM00-2016-F-0440-R001, Biological Opinion for Ongoing Livestock Management on the Sacramento and Dry Canyon Allotments; October 5, 2018.

2. *The Service anticipates minor, temporary, direct, and indirect effects to areas currently occupied by jumping mice through occasional unauthorized use, which will be minimized by more frequent inspections and monitoring*.

3. *Most of the impacts to suitable habitat within exclosures will be due to infrequent, random events and are anticipated to be short-term from frequent inspections and monitoring*.

4. *The implementation of protective measures for the jumping mouse will result in an increase in protected habitat area and connectivity over existing conditions*.

5. *The Forest Service adjusted their proposed action and are committed to initiating a series of protective and recovery actions designed to reduce direct and indirect threats and improve the status of the jumping mouse.*

The Service does not believe the likelihood of survival and recovery of the jumping mouse will be compromised due to the implementation of the proposed action because *improved habitat quality and quantity are anticipated as the PCEs in riparian areas are predominantly restored and maintained due to fencing and changes in management*." …

The *conclusions of this biological opinion are based on full implementation of the project as described in the Description of the Proposed Action section of this document, including any Conservation Measures* that were incorporated into the project design." [18]

As we document below, in the Biological Opinion on Sacramento Allotment grazing along Upper Rio Peñasco and Wills Canyon/Mauldin Springs Critical Habitat Units, each of these assumptions are not being fulfilled.

In its October 5, 2018, Biological Opinion on the Sacramento Allotment, FWS also concludes that the level of Incidental Take "is not likely to jeopardize the continued existence of the jumping mouse…" [and] "based this determination on the small amount of habitat to be temporarily impacted and because we expect that connectivity will be improved through livestock management and fencing." [page 99-100]

"Because the jumping mouse is intimately tied to its habitat, take may occur in areas that currently contain suitable physical and biological features of habitat if those features would be adversely affected by the proposed action, as well as in areas that are prevented from developing suitable physical and biological features by the proposed action.

As a result, we are using suitable habitat within exclosures (116 ha (286 ac)) as well as riparian and upland habitat outside of exclosures as a surrogate for determining when the authorized take has been exceeded. This metric is appropriate because suitable jumping mouse habitat is composed of dense herbaceous riparian vegetation and intact adjacent uplands, which are elements of habitat that are anticipated to be altered or disturbed if livestock temporarily enter exclosures or over utilize areas in critical habitat. Take may occur outside of exclosures where livestock may concentrate due to topography or livestock management practices. The Service assumes that this will occur in designated critical habitat outside of exclosures. It is likely that some level of habitat alteration will result in take during implementation of the proposed action.  In these cases, take would likely be in the form of reduced habitat suitability that may affect individual mice (and

---

[18] Ibid., pages 94-95.

much needed recruitment) by reducing food, cover, or increased potential for predation due to loss of cover or a need to move.

***Incidental take will be determined by using the severity of impact from unauthorized livestock grazing in exclosure areas or closed grazing areas and utilization in jumping mouse habitat outside of exclosures.*** The following scenarios are defined by the impacts to habitat using the Landscape Appearance Method (BLM 1999), stubble height measurements, or other appropriate methodology. Take is authorized in the following scenarios:

1) ***Up to 20% herbaceous utilization averaged for any given exclosure after documented unauthorized use***; or

2) Up to 35% herbaceous utilization within designated critical habitat, both riparian and upland, outside of exclosures where livestock grazing is authorized. The exception would be in water gaps where livestock may concentrate, within corrals, within the horse pasture, or in the Peñasco trap outside of the 5-acre temporary exclosure.

If this amount of take is exceeded (as stated above), then as provided in 50 CFR Section 402.16, reinitiation of formal consultation would be required."[19]

As we document below, in the Biological Opinion on Sacramento Allotment grazing along Upper Rio Peñasco and Wills Canyon/Mauldin Springs Critical Habitat Units, "[u]p to 20% herbaceous utilization" has been surpassed in multiple exclosures by documented unauthorized use. This requires reinitiation of formal consultation.

FWS' October 5, 2018, Biological Opinion on the Sacramento Allotment provides for Terms and Conditions so that the Lincoln National Forest and the Sacramento Allotment permittee will be exempt from the prohibitions of section 9 ("Taking") of the Endangered Species Act.

Specifically, FWS October 5, 2018, Biological Opinion, states (***emphasis added***),

"Terms and Conditions

In order to be exempt from the prohibitions of section 9 of the Act, the Forest Service and their employees, contractors, or subcontractors must comply with the following terms and conditions, which implement the reasonable and prudent measures described above and outline required reporting/monitoring. These terms and conditions are nondiscretionary.

The Service establishes the following Terms and Conditions to implement Reasonable and Prudent Measure 1.

1.1 ***The Forest Service will perform compliance checks two times per week throughout the grazing season*** and provide results to the Service after each grazing season.

1.2 The Forest Service will conduct and record ocular estimates using the Landscape Appearance Method at established photo points in each protected area four times during the grazing season.

1.3 The Forest Service will also monitor key species utilization of forage at established photo points in the action area throughout the grazing season.

---

[19] Ibid., pages 99-100.

1.4   The Forest Service will annually evaluate the presence or absence of PCEs within the riparian component of all areas of critical habitat in the action area via an appropriate methodology, agreed upon by the Forest Service and the Service.

1.5   ***If livestock gain entry into exclosures, the Forest Service will contact the permittee within 24 hours of their discovery***.

1.6   If livestock gain entry into exclosures, the Forest Service will analyze impact to the area relative to the incidental take scale as estimated with the Landscape Appearance Method or other suitable method. The Forest Service shall report to the Service the extent of habitat affected within 72 hours if allocated take has been exceeded to plan any emergency remedial action, if necessary, and to discuss if reinitiation of formal consultation is warranted.

1.7   The Forest Service shall discuss conservation measures, management actions, and terms and conditions that limit grazing impacts in jumping mouse habitat with all permittees to ensure that ongoing livestock grazing does not affect jumping mouse habitat outside of exclosures and beyond conservative use.

1.8   ***The Forest Service shall ensure that exclosures and other fences are functional and maintained prior to livestock entry for the grazing season and throughout the grazing season***.

1.9   The Forest Service shall report any unauthorized activities (i.e., impacts outside of the proposed action) immediately to the Service.

1.10  The Forest Service shall provide an annual post-grazing season report documenting how the project complied with the proposed action (i.e., implementation monitoring) by the end of each calendar year.

1.11  The Forest Service shall work with the Allotment Permittees to reduce incursions into jumping mouse exclosures.

1.12  The Forest Service shall minimize the effects of herding, trailing, and trampling and report measures taken in their annual post-grazing season report.

1.13  To lessen or eliminate detrimental effects to riparian areas, the Forest Service shall encourage grazing allotment permittees in the action area to trail livestock outside of riparian areas while moving cattle to and from grazing pastures, where feasible.

1.14  ***To reduce the likelihood or amount of take occurring within exclosures in critical habitat, Forest Service shall minimize utilization of grazing allotment forage to less than 20% within these exclosures***.

The Service established the following Term and Condition to implement Reasonable and Prudent Measure 2.

2.1   ***The Forest Service will assess conditions of jumping mouse habitat throughout each grazing season*** and work with the Service to design and implement adaptive management the following grazing seasons to minimize impacts to jumping mouse habitat.

11

Review requirement: The Service designed reasonable and prudent measures, with their implementing terms and conditions, to minimize incidental take that might otherwise result from the proposed action. If, during the course of the action, the level of incidental take is exceeded, such incidental take would represent new information requiring review of the reasonable and prudent measures provided. The Forest Service must immediately provide an explanation of the causes of the taking and review with the New Mexico Ecological Services Office the need for possible modification of the reasonable and prudent measures."[20]

These "Terms and Conditions" are mandatory.  As we document below, in the Biological Opinion on Sacramento Allotment grazing along Upper Rio Peñasco and Wills Canyon/Mauldin Springs Critical Habitat Units, most of these mandatory "Terms and Conditions" are being violated. If the following mandatory "Terms and Conditions" were not being violated, there would not be such widespread destruction of NMMJM CH evident.  The mandatory "Terms and Conditions" that are being violated include:

1.1   The Forest Service will perform compliance checks two times per week throughout the grazing season and provide results to the Service after each grazing season.

1.2   The Forest Service will conduct and record ocular estimates using the Landscape Appearance Method at established photo points in each protected area four times during the grazing season.

1.3   The Forest Service will also monitor key species utilization of forage at established photo points in the action area throughout the grazing season. …

1.5   If livestock gain entry into exclosures, the Forest Service will contact the permittee within 24 hours of their discovery.

1.6   If livestock gain entry into exclosures, the Forest Service will analyze impact to the area relative to the incidental take scale as estimated with the Landscape Appearance Method or other suitable method. The Forest Service shall report to the Service the extent of habitat affected within 72 hours if allocated take has been exceeded to plan any emergency remedial action, if necessary, and to discuss if reinitiation of formal consultation is warranted. …

1.8   The Forest Service shall ensure that exclosures and other fences are functional and maintained prior to livestock entry for the grazing season and throughout the grazing season.

1.14  To reduce the likelihood or amount of take occurring within exclosures in critical habitat, Forest Service shall minimize utilization of grazing allotment forage to less than 20% within these exclosures.

The precarious status of NMMJM is succinctly summarized in FWS' May 27, 2014, Species Status Assessment,

"Our assessment found the New Mexico meadow jumping mouse having an overall low viability (probability of persistence) and a high probability of extinction in the near term (between now and the next 10 years), and a decreasing viability in the long-term

---

[20] Ibid., pages 101-102.

future (beyond 10 years) because we expect remaining populations are vulnerable to extirpation."[21]

The habitat required for New Mexico meadow jumping mouse is consistently well described and documented.  FWS' May 27, 2014, Species Status Assessment, describes NMMJM specialized habitat needs,

> "The New Mexico meadow jumping mouse has exceptionally specialized habitat requirements to support these life history needs and maintain adequate population sizes. Habitat requirements are characterized by tall (averaging at least 61 cm (24 in)), dense riparian herbaceous vegetation (plants with no woody tissue) primarily composed of sedges (plants in the Cyperaceae Family that superficially resemble grasses but usually have triangular stems) and forbs (broad-leafed herbaceous plants). This suitable habitat is only found when wetland vegetation achieves full growth potential associated with seasonally available or perennial flowing water. This vegetation is an important resource need for the New Mexico meadow jumping mouse because it provides vital food sources (insects and seeds), as well as the structural material for building day nests that are used for shelter from predators. It is imperative that the New Mexico meadow jumping mouse have rich abundant food sources during the summer so it can accumulate sufficient fat reserves to survive their long hibernation period. In addition, individual jumping mice also need intact upland areas that are up gradient and beyond the floodplain of rivers and streams and adjacent to riparian areas and wetlands because this is where they build nests or use burrows to give birth to young in the summer and to hibernate over the winter. …

> These suitable habitat conditions need to be in appropriate locations and of adequate sizes to support healthy populations of the New Mexico meadow jumping mouse. Historically, these wetland habitats would have been in large patches (movements of 200 to 700 meters (m) (656 to 2,297 feet (ft)) to disperse to other habitat patches within stream segments) located intermittently along long stretches of streams. Connectivity between patches of suitable habitat is necessary to facilitate daily and seasonal movements, and dispersal to increase the likelihood of long-term viability of jumping mouse populations."[22]

FWS' October 5, 2018, Sacramento grazing allotment Biological Opinion describes representative jumping mouse habitat:

> "…In addition to the summary information provided below, The Service completed a species status assessment report (SSA Report) for the jumping mouse in May 2014, which is hereby incorporated by reference (Service 2014b) …

> Habitat Requirements

> The jumping mouse is a habitat specialist (Frey 2006). It nests in dry soils, but uses moist, streamside, dense riparian/wetland vegetation up to an elevation of about 8,000 feet (Frey 2006).

> The jumping mouse appears to only utilize two riparian community types: 1) persistent emergent herbaceous wetlands (i.e., beaked sedge and reed canary grass alliances); and 2) scrubshrub wetlands (i.e., riparian areas along perennial streams that are

---

[21] Species status assessment report: New Mexico meadow jumping mouse (*Zapus hudsonius luteus*). U.S. Fish and Wildlife Service, Albuquerque, New Mexico; May 27, 2014; page 2.

[22] Ibid., page 3.

composed of willows and alders) (Frey 2005). It especially uses microhabitats of patches or stringers of tall dense sedges on moist soil along the edge of permanent water. Home ranges vary between 0.37 and 2.7 acres (0.15 and 1.1 hectares) and may overlap (Smith 1999).

New Mexico meadow jumping mice have limited dispersal capability and exhibit extreme site fidelity during daily activities (USFWS 2014b). Based on telemetry data, the distance at which groups of New Mexico meadow jumping mice become separated from other groups is likely no more than approximately 2,400 feet (732 meters). Daily movements are typically less than 330 feet (101 meters) (Frey and Wright 2012, USFWS 2014b). It is uncommon for this species to traverse areas of non-habitat. Colonization, recolonization, and dispersal between populations is dependent upon the availability of suitable riparian habitat between populations (USFWS 2014b). …

<u>New Mexico Meadow Jumping Mouse Designated Critical Habitat</u>

Critical habitat was designated for the jumping mouse on March 16, 2016 (81 FR 14263). The Service identified the following primary constituent elements as essential for the conservation of the subspecies:

1) Riparian communities along rivers and streams, springs and wetlands, or canals and ditches that contain:

a) Persistent emergent herbaceous wetlands especially characterized by presence of primarily forbs and sedges (Carex spp. or Schoenoplectus pungens); or

b) Scrub-shrub riparian areas that are composed of willows (Salix spp.) or alders (Alnus spp.) with an understory of primarily forbs and sedges; and

2) Flowing water that provides saturated soils throughout the New Mexico meadow jumping mouse's active season that supports tall (average stubble height of herbaceous vegetation of at least 61 cm (24 in)) and dense herbaceous riparian vegetation composed primarily of sedges (Carex spp. or Schoenoplectus pungens) and forbs, including, but not limited to one or more of the following associated species: spikerush (Eleocharis macrostachya), beaked sedge (Carex rostrata), rushes (Juncus spp. and Scirpus spp.), and numerous species of grasses such as bluegrass (Poa spp.), slender wheatgrass (Elymus trachycaulus), brome (Bromus spp.), foxtail barley (Hordeum jubatum), or Japanese brome (Bromus japonicas), and forbs such as water hemlock (Circuta douglasii), field mint (Mentha arvense), asters (Aster spp.), or cutleaf coneflower (Rudbeckia laciniata); and

3) Sufficient areas of 9 to 24 kilometers (5.6 to 15 miles) along a stream, ditch, or canal that contains suitable or restorable habitat to support movements of individual New Mexico meadow jumping mice; and

4) Adjacent floodplain and upland areas extending approximately 100 meters (330 feet) outward from the boundary between the active water channel and the floodplain (as defined by the bankfull stage of streams) or from the top edge of the ditch or canal."[23]

---

[23] Correspondence, from: Susan S. Millsap, Field Supervisor, U.S. Fish and Wildlife Service New Mexico Ecological Services Field Office, Albuquerque, NM; to: Travis G. Mosely, Forest Supervisor, Lincoln National Forest, Alamogordo,

FWS, in its March 16, 2016, Final Rule for Critical Habitat designation describes essential jumping mouse habitat similarly:

"Based on our current knowledge of the physical or biological features and habitat characteristics required to sustain the species' life-history processes (see chapter 2 in the SSA Report (Service 2014)), we determine that the PCEs [primary constituent elements] specific to the jumping mouse consist of the following:

(1) Riparian communities along rivers and streams, springs and wetlands, or canals and ditches that contain:

(a) Persistent emergent herbaceous wetlands especially characterized by presence of primarily forbs and sedges (*Carex* spp. or *Schoenoplectus pungens*); or

(b) Scrub-shrub riparian areas that are dominated by willows (*Salix* spp.) or alders (*Alnus* spp.) with an understory of primarily forbs and sedges; and

(2) Flowing water that provides saturated soils throughout the jumping mouse's active season that supports tall (average stubble height of herbaceous vegetation of at least 61 cm (24 inches)) and dense herbaceous riparian vegetation composed primarily of sedges … and forbs … and …

(3) Sufficient areas of 9 to 24 km (5.6 to 15 mi) along a stream, ditch, or canal that contain suitable or restorable habitat to support movements of individual New Mexico meadow jumping mice…" [P.14293][24]

Frey (2017)[25] also describes jumping mouse habitat similarly,

"Habitat used by the New Mexico meadow jumping mouse in the White Mountains was similar to that reported for other montane populations, characterized by tall, dense herbaceous vegetation composed primarily of forbs and sedges on saturated soil in close proximity to flowing water. However, there was significantly more cover provided by alders (*Alnus* spp.) at capture sites at both the stream reach and microhabitat scales.

…these results confirm that the New Mexico meadow jumping mouse is a riparian specialist that utilizes tall, dense herbaceous vegetation on saturated soil. P. 51

…because herbaceous riparian habitat is limited in distribution and is particularly sensitive to disturbances, it is the availability of this foraging habitat that is a key limiting factor for the New Mexico meadow jumping mouse."

---

NM; RE: Cons. #02ENNM00-2016-F-0440-R001, Biological Opinion for Ongoing Livestock Management on the Sacramento and Dry Canyon Allotments; October 5, 2018.

[24] Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the New Mexico Meadow Jumping Mouse, Fish and Wildlife Service, Final Rule, 81 FR 14264, March 16, 2016.

[25] "Landscape Scale and Microhabitat of the Endangered New Mexico Meadow Jumping Mouse in the White Mountains, Arizona, Jennifer K. Frey, Journal of the Fish and Wildlife Management, June 2017.

The current Forest Service website (accessed September 1, 2019) for jumping mouse, https://www.fs.usda.gov/detail/r3/home/?cid=stelprd3809040,[26] also describes and includes a representative healthy habitat image for NMMJM,

> "The jumping mouse has very specific habitat requirements.  It requires perennial or seasonally perennial water and saturated soils that produce tall (24+ inch) herbaceous riparian plants, and intact adjacent uplands (see image below).
>
> **Below:** This image of critical habitat on the Santa Fe National Forest displays the tall herbaceous riparian vegetation and adjacent intact upland habitat that is essential to the species."



On August 1-4, 2019, we visited each of the five areas of New Mexico Meadow Jumping Mouse Critical Habitat, Silver Springs, Agua Chiquita, Middle Rio Peñasco, Wills Canyon (Mauldin Springs), and Upper Rio Peñasco.  Each of the five areas are experiencing significant destruction, adverse modification of Critical Habitat.

We visited the Wills Canyon/Mauldin Springs Critical Habitat Unit on August 3, 2019.  Like the above Forest Service website description and image of healthy NMMJM habitat, we note that the two elk type exclosures at Mauldin Springs in the Wills Canyon/Mauldin Springs Critical Habitat Unit are allowing healthy NMMJM habitat to survive and to recover.

---

[26] USDA Forest Service website, NM Meadow Jumping Mouse: Home Page, https://www.fs.usda.gov/detail/r3/home/?cid=stelprd3809040; accessed, September 1, 2019.



© Robin Silver                                    © Robin Silver




© Robin Silver                                   © Robin Silver



© Robin Silver



© Robin Silver

Between the two elk fenced Mauldin Springs exclosures there is an ineffective electric fence without a noticeable protective effect on the inside of the exclosure to the right of the image:



©Robin Silver

And a denuded water gap:



© Robin Silver



© Robin Silver

Upstream of Mauldin Springs, however, widespread devastation of habitat is apparent:



© Robin Silver

     When compared to the prior pages' images of the ground cover within the exclosures, this area looks as if it is an example of a violation of the October 5, 2018, Sacramento allotment Biological Opinion's allowance of "up to 35% herbaceous utilization within Critical Habitat" as a "surrogate for determining when the authorized take has been exceeded."

Immediately outside of the exclosures the protective effect of the exclosure is stark:



©Robin Silver

And,



© Robin Silver



© Robin Silver

Below Mauldin Springs the electric fence exclosures are also ineffectual.  This image illustrates the worthlessness of the electric exclosures and the loss outside of the elk exclosure of the essential dense, minimally 24-inch tall herbaceous forbs and sedges necessary for NMMJM survival and recovery.   The area within the electric fence on the left of the image looks as if it is an example of a violation of the October 5, 2018, Sacramento allotment Biological Opinion's allowance of "up to 20% herbaceous utilization for any given exclosure" as a "surrogate for determining when the authorized take has been exceeded."

A little bit further downstream from the lower Mauldin Springs elk exclosure, the electric fence is obviously making no difference:



© Robin Silver

The area within the electric fence on the right looks as if it is an example of a violation of the October 5, 2018, Sacramento allotment Biological Opinion's allowance of "up to 20% herbaceous utilization for any given exclosure" as a "surrogate for determining when authorizing take has been exceeded."  On the left of the electric fence, the area looks as if it is an example of a violation of the allowance of "up to 35% herbaceous utilization within Critical Habitat" as a "surrogate for determining when the authorized take has been exceeded" when compared to the exclosures imaged in the proceeding pages.

Here's a bull inside the electric fence exclosure below Mauldin Springs:



© Robin Silver



© Robin Silver

Here is a close-up of this bull's brand:



© Robin Silver

Near this bull we identify a calf with a clearer version of the same brand:



© Robin Silver

Near this bull and calf, we document another brand:



@ Robin Silver

Moving further downstream from Mauldin Springs into Wills Canyon, the same ground cover loss is dramatically evident with no difference noted inside and outside of the electric fence exclosure.  The area lacks the essential dense, minimally 24-inch tall, herbaceous forbs and sedges required by NMMJM for survival and recovery.  This habitat damage is obviously chronic as well as acute:



© Robin Silver

The area within the electric fence on the right looks as if it is an example of a violation of the October 5, 2018, Sacramento allotment Biological Opinion's allowance of "up to 20% herbaceous utilization for any given exclosure" as a "surrogate for determining when authorizing take has been exceeded."  On the left of the electric fence, the area looks as if it is an example of a violation of the allowance of "up to 35% herbaceous utilization within Critical Habitat" as a "surrogate for determining when the authorized take has been exceeded."

An example of intact electric fencing whose deterrent shock is not working:



© Robin Silver

And further down Wills Canyon we observed widespread disrepair of the electric fencing without evidence of any protection from the exclosure:



© Robin Silver

All along Wills Canyon, cows were observed inside of the exclosures.  Here's an example:



© Robin Silver



© Robin Silver

One brand is documented here:



© Robin Silver

On August 2, 2019, we visited the Agua Chiquita Creek Critical Habitat Unit.  Like the Wills Canyon/Mauldin Springs Critical Habitat Unit, the Agua Chiquita Creek Critical Habitat Unit suffers from chronic and acute, significant degradation of both meadow and riparian habitat, ineffectual fencing, and widespread cattle grazing in the riparian area that is supposed to be protected.

This electric fence exclosure shows no protective fence line effect with no difference noticed on either side of the fence:



© Robin Silver

Denuded Critical Habitat inside of ineffective electric fence exclosures is widespread:



© Robin Silver



© Robin Silver

   This certainly seems to violate FWS' April 28, 2017, Agua Chiquita allotment concurrence promise that "(g)razing will not exceed 35 percent utilization."

The metal pipe fence exclosure at Barrel Springs shows no fence line protection effect.  You can't tell, but the inside of the exclosure is to the left side of the image:



© Robin Silver

The area within the Barrel Springs metal pipe fence exclosure is heavily grazed by cows:



© Robin Silver

This certainly seems like a violation of the April 28, 2017, FWS Concurrence reliance that "[n]o livestock grazing will take place in the riparian pasture."

A broken and ineffective metal pipe fence with cattle path to and from damaged fencing:



© Robin Silver



@ Robin Silver

At another location, another damaged, ineffective metal pipe fence with cattle path is noted:



© Robin Silver

Widespread, chronically heavy grazing with gross loss of riparian vegetation within metal pipe fenced exclosures is noted:



© Robin Silver



© Robin Silver

This certainly seems like another violation of the April 28, 2017, FWS Agua Chiquita concurrence reliance that "[n]o livestock grazing will take place in the riparian pasture." Further…

Cows are found inside of a metal pipe fenced exclosure:



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver

Here's an ear tag of one of the cows inside metal pipe fence exclosure:



© Robin Silver

Here is a brand of a cow inside the metal pipe fence exclosure:



© Robin Silver

At Sand Springs, the chronic trespass entry point trail in and out of the metal pipe fenced exclosure is documented:



© Robin Silver



© Robin Silver

The fact that this trespass entry point is chronic is evidenced by the lack of protective fence line with no difference on either side of the metal pipe fence.  The inside of the exclosure is to the right side of the image:



© Robin Silver

On August 3, 2019, we visited the Middle Rio Peñasco Critical Habitat Unit.  Like the Wills Canyon/Mauldin Springs Critical Habitat Unit, and the Agua Chiquita Creek Critical Habitat Unit, the Middle Rio Peñasco Critical Habitat Unit also suffers from chronic degradation of meadow and riparian habitat, ineffectual fencing, and widespread cattle grazing in the riparian area that is supposed to be protected.

Cutting and disrepair of barbed wire exclosure fencing is widespread:



© Robin Silver



© Robin Silver



© Robin Silver

Electric exclosure fencing is in disrepair and ineffectual:



© Robin Silver



© Robin Silver

A cow is documented inside a fenced Critical Habitat exclosure:



© Robin Silver

Another cow stands inside a fenced Critical Habitat exclosure in front of a fence with a cut top strand:



© Robin Silver

Here is an image of the brand of one of the cows within an exclosure:



© Robin Silver

Here are images documenting ear tags from two different cows within an exclosure:



© Robin Silver



© Robin Silver

A cow exits from inside a Critical Habitat exclosure through fence with a cut upper strand:



© Robin Silver



© Robin Silver

Grazing within exclosures is heavy, widespread and obviously chronic:



© Robin Silver



© Robin Silver

The above images illustrate violations of the September 17, 2017, Biological Assessment for the Bounds Allotment and the October 4, 2017, FWS Bounds allotment concurrence which promise only "dormant season grazing."  In addition, since there is a promise of only "dormant season grazing," there is only utilization limits during the dormant season of "for up to 20% utilization in NMMJM habitat."  Utilization here is obviously much greater than the 20% utilization during the non-dormant season.  The area lacks the essential dense, minimally 24-inch tall, herbaceous forbs and sedges required by NMMJM for survival and recovery.



On August 4, 2019, we visited the Upper Rio Peñasco Critical Habitat Unit.  Like the Wills Canyon/Mauldin Springs Critical Habitat Unit, the Agua Chiquita Creek Critical Habitat Unit, and the Middle Rio Peñasco Critical Habitat Unit, the Upper Rio Peñasco Critical Habitat Unit also suffers from chronic degradation of meadow and riparian habitat, ineffectual fencing, and widespread cattle grazing in the riparian area that is supposed to be protected.

Fencing is absent or in gross disrepair.  Widespread areas have fence posts without fencing:



© Robin Silver

In many other areas the fences are simply in disrepair:



© Robin Silver



© Robin Silver

Pervasive chronic and heavy grazing is apparent within the riparian areas:



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver

These images above within the Upper Rio Peñasco Critical Habitat Unit exclosure looks as if it is an example of a violation of the October 5, 2018, Sacramento allotment Biological Opinion's allowance of "up to 35% herbaceous utilization within Critical Habitat" as a "surrogate for determining when the authorized take has been exceeded."

Further downstream, many cows are found within the Upper Rio Peñasco riparian area:



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver

The following brands are documented within the Upper Rio Peñasco riparian area:



© Robin Silver



© Robin Silver



© Robin Silver



© Robin Silver

On August 1, 2019, we visited the Silver Springs Creek Critical Habitat Unit.  Similar to the Wills Canyon/Mauldin Springs Critical Habitat Unit, the Agua Chiquita Creek Critical Habitat Unit, the Middle Rio Peñasco Critical Habitat Unit and the Upper Rio Peñasco Critical Habitat Unit, the Silver Springs Creek Critical Habitat Unit also suffers from degradation of meadow and riparian habitat.  Unlike the other Critical Habitat Units, however, the damage here is from stray horses, likely from the nearby Mescalero Apache Tribal lands.

The riparian area shows evidence of mild to moderate grazing.  Note the lack of preservation of the essential dense, minimally 24-inch tall herbaceous forbs and sedges necessary for NMMJM survival and recovery:



© Robin Silver



© Robin Silver

## LEGAL STATUTORY AND REGULATORY FRAMEWORK
### Endangered Species Act

Section 4 of the ESA directs the Secretary of the Interior to designate species that are threatened or endangered with extinction, and to designate "critical habitat" for such species. 16 U.S.C. § 1533(a). Section 4 also requires the Secretary to develop and implement recovery plans for the conservation and survival of threatened and endangered species, unless the Secretary finds that such a plan will not promote the conservation of the species. 16 U.S.C. § 1533(f).

Section 7 of the ESA requires each federal agency, in consultation with FWS, to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species, or result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2). For each proposed action, the action agency must request from FWS whether any listed or proposed species may be present in the area of the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. If listed or proposed species may be present, the action agency must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. *Id*. If the agency determines that its proposed action may affect any listed species or critical habitat, the agency must engage in "formal consultation" with FWS. 50 C.F.R. § 402.14.

To complete formal consultation, FWS must provide the action agency with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. The biological opinion "is required to address both the 'no jeopardy' and 'no adverse modification' prongs of Section 7." *Center for Biological Diversity v. Bureau of Land Management*, 422 F. Supp. 2d 1115, 1127 (N.D. Cal. 2006), *citing* 50 C.F.R. § 402.14(g)(4). If FWS concludes in the biological opinion that the proposed action will jeopardize the continued existence of a listed species, or will result in the destruction or adverse modification of critical habitat, FWS must outline "reasonable and prudent alternatives" to the proposed action that FWS believes would not jeopardize listed species or result in the destruction or adverse modification of critical habitat. 16 U.S.C. § 1536(b)(3)(A).

If the biological opinion concludes that the proposed action is not likely to jeopardize the continued existence of a listed species, or result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the species, any "reasonable and prudent measures" that FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). In order to monitor the impacts of incidental take, the agency must report the impact of its action on the listed species to FWS. 50 C.F.R. § 402.14(i)(3). If during the course of the action the amount or extent of incidental taking is exceeded, the agency must reinitiate consultation immediately. 50 C.F.R. § 401.14(i)(4); *see also* 50 C.F.R. § 402.16.

The ESA requires the action agency and FWS to reinitiate formal consultation where discretionary federal involvement or control over the action has been retained or is authorized by law and: (1) if the amount or extent of taking specified in the incidental take statement is exceeded; (2) if new information reveals effects of the action that may affected listed species or critical habitat in a manner or to an extent not previously considered; (3) if the action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or (4) if a new species is listed or critical habitat designated that may be affected

by the action.  50 C.F.R. § 402.16.

In addition to the obligation to avoid jeopardizing species under section 7(a)(2), Section 7(a)(1) of the ESA also imposes an obligation on all federal agencies, in consultation with the FWS, to "carry[] out programs for the conservation" of listed species. 16 U.S.C. § 1536(a)(1). This provision imposes an "affirmative duty on each federal agency to conserve each of the species listed." *Sierra Club v. Glickman,* 156 F.3d 606,616 (5th Cir. 1998); *accord Pyramid Lake Paiute Tribe of Indians v. Dep't of the Navy,* 898 F.2d 1410, 1416-17 (9th Cir. 1990) (noting that federal agencies have "affirmative obligations to conserve under [S]ection 7(a)(1)"). "Conserve" is defined by the Act to mean *recovery, i.e.,* the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter arc no longer necessary." 16 U.S.C. § 1536(a)(1).

Section 9 of the ESA and its implementing regulations prohibit the unauthorized "take" of any endangered or threatened species of fish or wildlife.  16 U.S.C. § 1538(a)(1); 16 U.S.C. § 1533(d); 50 C.F.R. § 17.31.  "Take" is defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding or killing a protected species either directly or by degrading its habitat.  16 U.S.C. § 1532(19).

Section 4(f) of the ESA requires that the "Secretary shall develop and implement Recovery Plans for the conservation and survival of endangered species. 16 U.S.C. § 1533(f).

## <u>SUMMARY AND VIOLATIONS OF THE ESA</u>

The New Mexico Meadow Jumping Mouse ("NMMJM") represents the health of upper elevation meadows and streams in Eastern Arizona, Southern Colorado and New Mexico.  NMMJM is endangered because of the destruction of these upper elevation meadows and streams upon which NMMJM requires for survival.  Survival and recovery of NMMJM requires protection and recovery of these upper elevation meadows and streams such as is now designated as Critical Habitat at Upper Rio Peñasco, Middle Rio Peñasco, Wills Canyon, Mauldin Springs, Agua Chiquita Creek in the Sacramento Mountains.

In their June 10, 2014, listing of the New Mexico meadow jumping mouse as endangered, FWS warned:

"Our assessment concluded that the New Mexico meadow jumping mouse has an overall low viability (probability of persistence) in the near term (between now and the next 10 years) and a decreasing viability in the longterm future (beyond 10 years). [page 33120] …

In considering the area needed for maintaining resilient populations of adequate size with the ability to endure adverse events (such as floods or wildfire), we estimate that resilient populations of jumping mice need connected areas of suitable habitat in the range of at least about 27.5 to 73.2 hectares (ha) (68 to 181 acres (ac)), along 9 to 24 kilometers (km) (6 to 15 miles (mi)) of flowing streams, ditches, or canals. The minimum area needed is given as a range due to the uncertainty of an absolute minimum and because local conditions within drainages will vary. This distribution and amount of suitable habitat would allow for multiple subpopulations of New Mexico meadow jumping mice to exist along drainages and would provide for sources of recolonization if some areas were extirpated due to disturbances.

The suitable habitat patches must be relatively close together, no more than about 100 m (330 ft) apart, because the New Mexico meadow jumping mouse has limited movement and dispersal capacity for natural recolonization. Rangewide, we determined that the New Mexico meadow jumping mouse needs at least two resilient populations (where at least two existed historically) within each of eight identified geographic management areas. This number and distribution of resilient populations is expected to provide the subspecies with the necessary redundancy and representation to provide for viability. [page 33121] …

Nearly all of the current populations are isolated and widely separated, and all of the 29 populations located since 2005 have patches of suitable habitat that are too small to support resilient populations of New Mexico meadow jumping mouse. [page 33121] …

Considering the subspecies' biological status now and its likely status into the future, without active conservation (i.e., grazing management and water management) existing populations are vulnerable to extirpation (at least 11 have already undergone substantial impacts since 2011) and, therefore, the subspecies as a whole is currently at an elevated risk of extinction. None of the 29 populations known to exist since 2005 are of sufficient size to be resilient.

Assuming this rate of population loss continues similar to recent years, the number of populations could be severely curtailed in the near term, eliminating the level of redundancy needed to withstand catastrophic drought and wildfire, along with the additive impacts of multiple threats. In addition to past sources of habitat loss, ongoing grazing, water shortages, and high-impact wildfire (the latter two exacerbated by climate change) will continue to put all of the remaining locations at considerable risk of extirpation in the near-term (between now and the next 10 years) and increasing over the long term. [page 33122][27]

With this Notice, we present newly documented evidence that significant adverse modification and destruction of jumping mouse Critical Habitat is occurring in the Sacramento Mountains on the Lincoln National Forest. Of the five Critical Habitat Units in the Sacramento Mountains, four, Wills Canyon/Mauldin Springs, Agua Chiquita Creek, Upper Rio Peñasco and Middle Rio Peñasco exhibit evidence of moderate to severe chronic and acute damage, and one, Silver Springs exhibits evidence of mild to moderate acute damage. None of these facts were anticipated nor considered in FWS' April 28, 2017, Concurrence for the Agua Chiquita Allotment, FWS' October 4, 2017, FWS' Concurrence for the Bounds Allotment, and FWS' October 5, 2018, Biological Opinion for the Sacramento Allotment.

FWS' April 28, 2017, Concurrence for the Agua Chiquita Allotment, FWS' Concurrence for the Bounds Allotment, and FWS' October 5, 2018, Biological Opinion for the Sacramento Allotment relied on Forest Service commitments to protect NMMJM and its Critical Habitat. These commitments are summarized on pages 6-12 of this Notice above. The Forest Service has not kept these commitments.

FWS' April 28, 2017, Concurrence for the Agua Chiquita Allotment, FWS' October 4, 2017, Concurrence for the Bounds Allotment, and FWS' October 5, 2018, Biological Opinion for the

---

[27] Determination of Endangered Status for the New Mexico Meadow Jumping Mouse Throughout Its Range, Final Rule, U.S. Fish and Wildlife Service, 79 FR 33119, June 10, 2014.

Sacramento Allotment violate the ESA and are arbitrary, capricious, an abuse of discretion, and not in accordance with law for a number of reasons, including but not limited to the following: (1) FWS errantly underestimated the degree to which cattle grazing on the Agua Chiquita and Sacramento allotments would result in the adverse modification and destruction of Critical Habitat; (2) in determining no jeopardy for NMMJM, FWS failed to properly consider relevant factors and the overall cumulative impacts of abusive, illegal, and essentially unsupervised cattle grazing on the critically endangered NMMJM and its Critical Habitat; (3) FWS errantly assumed that Incidental Take would not be exceeded in the Sacramento allotment Biological Opinion; (4) FWS failed to issue an Incidental Take Statement for the Agua Chiquita allotment, and instead arbitrarily concurred with the Forest Service's not likely to adversely affect determination; and (5) FWS failed to properly analyze and consider the cattle grazing impacts of the Agua Chiquita and Sacramento allotments on NMMJM recovery and its Critical Habitat.

The Forest Service has an independent, substantive duty under Section 7 of the ESA to ensure that its actions are not likely to jeopardize listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2). Because the April 28, 2017, Concurrence for the Agua Chiquita allotment, October 4, 2017, Concurrence for the Bounds Allotment, and the October 5, 2018, Biological Opinion for the Sacramento allotment violate the ESA and are unlawful, the Forest Service's reliance on the Concurrences and the Biological Opinion to fulfill its Section 7 procedural and substantive obligations for the Agua Chiquita and Sacramento allotments is also arbitrary, capricious, and in violation of the ESA. *Center for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1010 (D. Az. 2011) (an action agency's reliance on a legally flawed biological opinion is arbitrary and capricious). Without a lawful and valid Biological Opinion for the Agua Chiquita and Sacramento allotments, the Forest Service has failed to ensure that continued implementation of cattle grazing on the allotments is not likely to jeopardize the continued existence of jumping mouse or result in the destruction or adverse modification of its critical habitat, as required by ESA. Id.; 16 U.S.C. § 1536(a)(2).

FWS and the Forest Service have violated and remain in ongoing violation of the ESA for failing to reinitiate consultation concerning the ongoing impacts to NMMJM and its Critical Habitat on the Agua Chiquita and Sacramento allotments, even though (1) (1) the amount and extent of anticipated Incidental Take has been exceeded; (2) new information reveals effects of the Agua Chiquita and Sacramento allotments that are affecting NMMJM and its Critical Habitat in a manner and to an extent not previously considered; and (3) the Agua Chiquita and Sacramento allotments have been modified in a manner that causes effects to NMMJM and its Critical Habitat that were not considered in the 2017 Letter of Concurrence and 2018 Biological Opinion. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16.

FWS and the Forest Service have permitted, facilitated, authorized and allowed cattle grazing on the Agua Chiquita and Sacramento allotments that is adversely modifying and destroying NMMJM Critical Habitat, and jeopardizing the continued existence of NMMJM, in violation of the ESA. 16 U.S.C. § 1535(a)(2).

The Forest Service is in violation of Section 7(a)(1) of the ESA, where "all" federal agencies "shall, in consultation with and with the assistance of the [FWS], utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered and threatened species," as the Forest Service is jeopardizing the continued existence of the jumping mouse and allowing the continued destruction and adverse modification if its critical habitat. 16 U.S.C. § 1536(a)(1).

FWS is in violation of its mandatory obligation under Section 4 of the ESA to develop and

implement a Recovery Plan for the NMMJM. 16 U.S.C. § 1533(f).

## CONCLUSION

Most of us grew up with the biblical teachings of Noah and his Ark:

Genesis 9: 8 - 9 Then God said to Noah and to his sons with him: "I now establish my covenant with you and your descendants after you and with every living creature that was with you - the birds, the livestock, and all the wild animals, all those that came out of the ark with you - every living creature on the earth.

Genesis 9: 12 - 13 And God said, "This is the sign of the covenant I am making between me and you and every living creature with you, a covenant for all generations to come; I have set my rainbow in the clouds, and it will be the sign of the covenant between me and the earth.

Consistent with our culture of respecting the biblical teachings of Noah and his Ark, the Endangered Species Act reflects our Nation's policy:

"It Is further declared to be the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act. ... The purposes of this Act are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species..."[28]

Correspondingly and contemporaneously, our Public Lands are becoming our Nation's Ark. The upper elevation meadows and streams in the Sacramento Mountains represented by NMMJM are an example of Public Lands treasures that FWS and Forest Service officials are charged with protecting.

We are appalled and disgusted by our observations on the Lincoln National Forest that reveal complete disregard for our Nation's conservation policy by Forest Service officials and federal permittees. We present our observations and documentation of this disregard in this Notice. Our observations and documentation presented here deserve and demand emergent remedy.

In sixty days, the Center for Biological Diversity and Maricopa Audubon Society will seek judicial relief if you have still not taken corrected action to stop Incidental Take and have not reinitiated formal consultation regarding the destructive Forest Service action and activities on the Lincoln National Forest that are jeopardizing the New Mexico meadow jumping mouse and destroying and adversely modifying designated habitat to a degree not considered in the April 28, 2017, Concurrence for the Agua Chiquita allotment, and the October 5, 2018, Biological Opinion for the Sacramento allotment.

---

[28] Endangered Species Act of 1973, *16 U.S.C.* 1531 et seq., Sections 2(b) and (c).

CONTACT INFORMATION

If you have further questions, please contact Robin Silver, M.D., Center for Biological Diversity, P.O. Box 1178, Flagstaff, AZ 86002, by mail; by phone: (602) 799-3275, or by Email: rsilver@biologicaldiversity.org.

Sincerely,

Robin Silver, M.D.
Co-Founder and Board Member
Center for Biological Diversity

cc:   New Mexico Game and Fish Department Director Michael Sloane
      (via email: Michael.Sloane@state.nm.us)

      Marc Fink, Senior Attorney
      Center for Biological Diversity
      209 East 7th St.
      Duluth MN  55805
      (218) 464-0539
      mfink@biologicaldiversity.org