**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CENTER FOR BIOLOGICAL DIVERSITY
and MARICOPA AUDUBON SOCIETY,

     Petitioners,

v.                                                    Civ. No. 21-733 MIS/GBW

RANDY MOORE, *et al.*,

     Respondents.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

     THIS MATTER comes before me on Petitioner's Opening Merits Brief (*doc. 23*) pursuant to the Honorable Margaret I. Strickland's Order of Reference (*doc. 35*), referring this case to me for analysis, findings of fact, evidentiary hearings if warranted, and recommendations for its ultimate disposition.  Petitioners challenge the Fish and Wildlife Service's ("FWS") 2021 Biological Opinion (the "2021 BiOp") as well as the Forest Service's reliance on the 2021 BiOp to permit cattle grazing in the Sacramento Mountains under the Administrative Procedure Act and the Endangered Species Act. Having reviewed Petitioner's Opening Merits Brief, the attendant briefing, the administrative record (*doc. 17*), the supplemental administrative record (*doc. 24*), and all applicable law, and having conducted a hearing on the matter, *see doc. 43*, I RECOMMEND that the Court DENY AS MOOT Petitioners' challenge to the 2021 BiOp and request for an injunction and DISMISS Petitioners' Complaint (*doc. 1*).

I.     LEGAL BACKGROUND

The Endangered Species Act ("ESA") is a comprehensive statute designed to protect species from extinction.  Under the statute, the Fish and Wildlife Service ("FWS") is authorized to designate species as "threatened" or "endangered" and to designate portions of those species' habitat as "critical."  *See* 16 U.S.C. § 1533.  Once a species or its habitat is designated, the ESA imposes obligations on each federal agency to ensure that the species and habitat are not harmed by a federal action.  These obligations are primarily contained within "Section 7" and "Section 9" of the ESA.

Under Section 7 of the ESA, a federal agency has a duty to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species."  16 U.S.C. § 1536(a)(2). "Jeopardize the continued existence" is defined as "engag[ing] in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.

A federal agency fulfills its duty to insure that its action will not jeopardize a listed species or critical habitat by engaging in consultation with the Fish and Wildlife

Service ("FWS")[1] regarding any proposed action that "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). The agency's first step in consultation is typically to engage in informal consultation and/or to prepare a biological assessment ("BA"). *Id.* § 402.14(b). If, after this step, the agency and FWS conclude that the action "is not likely to adversely affect any listed species or critical habitat," the consultation process is complete. *Id.* If the agency and FWS do not come to this conclusion, the agency must engage in formal consultation with FWS. *Id.* § 402.14(a). During formal consultation, FWS compiles a variety of information and ultimately issues a biological opinion ("BiOp"), in which it determines whether the action is likely to jeopardize the continued existence of the species or result in the destruction or adverse modification of critical habitat. *Id.* § 402.14(h)(1)(iv). If FWS finds that the action is not likely to jeopardize the species or its habitat, it issues a "no jeopardy" BiOp which concludes consultation. *Id.* § 402.14(h)(1)(iv)(B). If FWS finds that the action is likely to jeopardize the species or its habitat, it issues a "jeopardy" BiOp which must include reasonable and prudent alternatives to the action. *Id.* § 402.14(h)(2).

If FWS finds that the federal action will not jeopardize the species pursuant to 16 U.S.C. § 1536(a)(2), but that the "take" (killing) of some listed animals is likely to occur,

---

[1] Agencies consult with FWS regarding animals that are under the jurisdiction of the Department of Interior (non-marine animals). Agencies consult with the National Marine Fisheries Service regarding animals that are under the jurisdiction of the Department of Commerce (marine animals). For the purposes of this case, the FWS is the consulting agency.

FWS may issue an Incidental Take Statement ("ITS").  50 C.F.R. § 402.14(i).  "Take" is

defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or

attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  The ITS must, in relevant

part, (1) specify the impact of the take on the species, (2) specify reasonable and prudent

measures that will minimize such impact, and (3) set forth the terms and conditions that

must be complied with by the agency regarding any takes.  50 C.F.R. § 402.14(i).  The

ITS also creates "triggers" (such as number of animals killed or amount of habitat

destroyed) that, if met, require the agency to immediately reinitiate consultation about

the action.  50 C.F.R. § 402.14(i)(4).

In addition to an agency's obligation under Section 7 to consult with FWS about

a proposed action that may affect a listed species or critical habitat, an agency also has

obligations under Section 9.  Section 9 of the ESA makes it illegal for any individual or

entity, including a federal agency, to "take" a listed species.  16 U.S.C. § 1538(a)(1)(B).

This prohibition is subject to several exceptions, including the ITS exception described

above.

Citizens may bring legal claims against a federal agency and the consulting

agency for alleged violations of the ESA under the ESA's citizen suit provision and

under the Administrative Procedure Act ("APA").  Section 11(g)(1)(A) of the ESA

allows any person to commence a civil suit in order to enjoin a federal agency which "is

alleged to be in violation of any provision of this chapter or regulation issued under the

authority thereof."  16 U.S.C. § 1540(g)(1)(A).  Section 11(g)(1)A) claims are permitted

against an agency for alleged violations of the agency's non-discretionary duties under

the ESA, including the prohibition against takes or following the conditions of

incidental take statements.  *Bennett v. Spear*, 520 U.S. 154, 173 (1997).  Claims which ask

the court to review discretionary agency actions under the ESA, including the decision

to issue a no jeopardy BiOp, are reviewed under the APA.  *Id.* at 178.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.  Procedural Background

The conflict in this case centers around the Forest Service's authorization of cattle

grazing in federal lands located in the Sacramento Mountains of New Mexico (the

"Sacramento Allotment" or "Allotment") because of the potential of cattle grazing to

harm the New Mexico Meadow Jumping Mouse ("NMMJM"), an endangered species.

The NMMJM was first listed as an endangered species in 2014.  Administrative

Record ("AR") 5365.  In 2016, the Forest Service initiated formal consultation with Fish

and Wildlife Service ("FWS") regarding ongoing grazing in the action area, and FWS

issued its first Biological Opinion ("BiOp") on October 20, 2016.  AR 1513.  In 2018, FWS

recommended that the Forest Service reinitiate consultation because several of the terms

and conditions in the relevant Incidental Take Statement were not met during the 2017

grazing season.  AR 1836.  FWS issued a second BiOp regarding grazing in the action

area on October 5, 2018.  AR 2076.  In 2020, Petitioners sued the Forest Service and FWS

regarding alleged continued violations of the ESA in the action area.  *See* Complaint, *Ctr. for Biological Diversity v. Christiansen et al.*, No. 1:20-cv-00863-WJ-JFR, *doc. 1* (D.N.M. Aug. 27, 2020).  Separately, the Forest Service requested a third formal consultation with FWS regarding several habitat improvement projects in the action area.  AR 4947.  The 2020 lawsuit was settled after the Forest Service and FWS agreed to accelerate the ongoing 2020 consultation and the issuance of the 2021 BiOp (the subject of the current lawsuit).  AR 5320-26.  The 2021 BiOp was issued on April 20, 2021.  AR 5339.

On August 5, 2021, Petitioners filed a complaint against the United States Forest Service, the Department of the Interior, and United States Fish and Wildlife Service ("FWS") alleging that the 2021 BiOp is still in violation of Sections 7 and 9 of the ESA as well as the APA.  *Doc. 1* at 41-46.  In their Opening Merits Brief, filed on January 7, 2022, Petitioners request that the Court vacate and remand the 2021 BiOp to the agencies and "enjoin the Forest Service from authorizing any grazing in the Allotment until the Court determines that a legally compliant BiOp is in place."  *Doc. 23* at 58-61.  Defendants responded on March 10, 2022, and argued that the 2021 BiOp is not in violation of the ESA or APA.  *Doc. 31.*  Defendants also submitted a supplemental record which contained records from the 2021 grazing season.  *See doc. 24.*  Briefing on Petitioner's Opening Brief was complete on April 15, 2022, with the filing of Petitioners' reply.  *Doc. 29.*

### B. Factual Background

i.      *The New Mexico Meadow Jumping Mouse ("NMMJM")*

The New Mexico Meadow Jumping Mouse ("NMMJM") is a listed endangered species that lives in Colorado, New Mexico, and Arizona.  AR 5366-67.  FWS has designated eight units of critical habitat for the mouse across the three states.  AR 1191-93.  These eight units are subdivided into 21 subunits, 19 of which are believed to be occupied by NMMJM.  *Id*.  Two of the subunits (one occupied and one believed to be unoccupied) are located in the Sacramento Allotment, the relevant action area of this lawsuit.  AR 5389

The NMMJM lives only in high elevation riparian and wetland habitats bordering a water source, and it requires dense vegetation that averages at least 24 inches tall.  AR 5366.  The NMMJM has a lifespan of about three years and produces few offspring throughout its life.  *Id.*  It hibernates between early October through late May and is only active for three or four months in the summer, during which time it must breed, raise its young, and eat enough food to survive the winter.  AR 5365.

The NMMJM's unique characteristics and habitat needs create several risk factors for the species' survival.  Because of the NMMJM's specific habitat needs, loss or alteration of habitat creates a "high potential for extirpation" of the species.  AR 5367.  For example, the NMMJM requires high food availability during its active months, and habitat modification can reduce food availability.  AR 5365.  In addition, the mice are

unlikely to use areas with unsuitable habitat or even migrate across areas with unsuitable habitat in order to colonize other areas with suitable habitat.  AR 5366.  As a result, individual NMMJM populations become isolated when surrounding areas become unsuitable habitat.  AR 5367.  The isolated populations then become genetically homogenous which makes them increasingly susceptible to catastrophic events and extirpation.  *Id.*

NMMJM habitat and population health are negatively affected by several external pressures.  The most significant pressure is likely livestock grazing which destroys habitat by destabilizing streambanks, collapsing NMMJM burrows, reducing the height of grasses, destroying other vegetative cover, separating riparian areas from water sources, and reducing food sources for the NMMJM.  AR 5368, 5411-12.  Other external pressures that threaten NMMJM populations include drought which reduces needed vegetation and water sources for the NMMJM and human recreation which damages habitat and disturbs NMMJM nests.  AR 5368-69.

ii.   *Action Area*

The 2021 BiOp examines the impact of cattle grazing on the NMMJM in two Allotments of National Forest lands in the Sacramento Mountains—the Sacramento and Dry Canyon Allotments.  AR 5349.  This case only concerns the Sacramento Allotment which is 111,213 acres.  *Doc. 23* at 12; AR 5349.  As noted above, NMMJM critical habitat is spread across parts of Colorado, New Mexico, and Arizona and is divided into eight

8

units and 21 subunits.  AR 1191-93.  Unit 4 is located in the Sacramento Mountains, and

subunits 4B and 4D are located in the Sacramento Allotment—Rio Peñasco (Subunit 4B)

and Wills Canyon (Subunit 4D).  AR 1188.  Wills Canyon is the only subunit within the

Sacramento Allotment believed to be occupied by NMMJM, although FWS has not

definitively decided that other parts of the Allotment are not occupied.  AR 4969, 5388.

Grazing on the Sacramento Allotment runs from May 15 to October 31 of each year.  AR

5350.

Because the main threat to the NMMJM is loss of suitable habitat, the Forest

Service protects NMMJM (and other endangered species) from cattle grazing by

installing fences which enclose certain areas (referred to as "exclosures") within

NMMJM critical habitat, including Wills Canyon and Rio Peñasco.  The fences installed

by the Forest Service are either "permanent" or "temporary."  Permanent fencing is

more effective than temporary fencing at excluding cattle, and permanent elk fencing

appears to be the most effective type of fence.  SAR 156.

Wills Canyon contains 268 acres of critical habitat.  AR 5414.  As of the date of the

2021 BiOp, there were eight exclosures in Wills Canyon (Wills 1-8), and two out of eight

exclosures (Wills 1 and 3) used permanent elk fencing.[2]  AR 4978; SAR 123.  The

remaining six enclosures (Wills 2 and 4-8) used temporary fencing.  AR 4978.  As of

2020, the NMMJM were likely exclusively located in the Wills 1-3 area, but the lack of

_____

[2] Wills 1 and 3 are also referred to as Upper and Lower Mauldin Springs.

suitable habitat in Wills 2 (due to temporary fencing around Wills 2) was limiting the

NMMJM's ability to migrate between the enclosures and establish larger, more stable

populations.  AR 4969-71.

Rio Peñasco contains 290 acres of critical habitat.  AR 5414.  As of the date of the

2021 BiOp, there were eight enclosures in Rio Peñasco, and three out of eight used

permanent fencing.  AR 4978.  The remaining five enclosures use temporary fencing.  *Id.*

The critical habitat in Rio Peñasco is assumed to be unoccupied by NMMJM.  *Id.*

  iii.  *Proposed Action and Conservation Measures in the 2021 BiOp*

The 2021 BiOp analyzes the effect of the Forest Service's proposed grazing

permits on the NMMJM, and it describes the conservation measures that the relevant

agencies will implement in order to protect the NMMJM.  In the 2021 BiOp, the FWS

ultimately concluded that the proposed grazing plan was not likely to jeopardize the

species (the "no jeopardy" finding).  AR 5441.  FWS based this finding on several

reasons including that a relatively small area of total critical habitat for the NMMJM is

impacted by the proposed action and that the conservation measures will improve

NMMJM habitat and species health in the Sacramento Allotment.  *Id.*  The BiOp also

concluded that the proposed action would not cause enough adverse modification of

critical habitat to harm the species (the "no adverse modification" determination).  AR

5418.

10

The conservation measures described in the 2021 BiOp are as follows.  First, the 2021 BiOp permits grazing on unfenced critical habitat up to 35% forage utilization, and it bans all grazing within fenced areas (temporary and permanent) on critical habitat.[3] AR 5361.

For Wills Canyon, the 2021 BiOp proposed two conservation measures regarding fencing: (1) annually updating the temporary electric fencing in the six non-permanent fenced areas with new temporary electric fencing between 2021 and 2023, and (2) installing permanent fencing in each of the six temporary fenced areas by 2023.  AR 4978, 5353-54, 5360.  As of the 2021 BiOp, 8 out of 268 acres of critical habitat (about 3%) in Wills Canyon were protected by permanent fencing.  AR 4978.  After the planned measures are implemented, 61.29 out of 268 acres of critical habitat (about 23%) will be protected by permanent fencing.  *Id.*

For Rio Peñasco, the 2021 BiOp proposed two similar conservation measures regarding fencing: (1) annually updating the temporary electric fencing in the five non-permanent fenced areas with new temporary electric fencing between 2021 and 2023, and (2) installing permanent fencing in each of the five temporary fenced areas by 2023. AR 4978, 5353-54, 5360.  As of the 2021 BiOp, 130.7 out of 290 acres of critical habitat

---

[3] Some grazing could still occur in fenced areas because the Incidental Take Statement in the 2021 BiOp permits grazing up to 20% utilization in permanent fenced areas and 35% utilization in temporary fenced areas and the agencies are not required to reinitiate consultation or change the action plan until the ITS limits are exceeded.  AR 5445-47.

(about 45%) in Wills Canyon were protected by permanent fencing. AR 4978. After the planned measures are implemented, 163.33 out of 290 acres of critical habitat (about 56%) will be protected by permanent fencing. *Id.*

The BiOp also requires that the Forest Service conduct monitoring of the permanent and temporary exclosures. Each permanent exclosure is checked once a week during the summer, and each temporary exclosure is checked twice a week during the summer, with additional checks if there are "chronic incursions" by livestock. AR 5361. If a cow is seen in an exclosure, the Forest Service has 24 hours to notify the permittee of the incursion, and the permittee has 72 hours to remove the cow. *Id.*

   iv.    *Updates Since the Issuance of the 2021 BiOp*

During the evidentiary hearing held before me on September 12, 2023, Respondents stated that as of September 2023, the Forest Service had completed the planned fencing upgrades detailed in the 2021 BiOp such that there are now thirteen completed permanent exclosures in the Allotment that are not intended for livestock use. *Doc. 43* at 2. In addition, Respondents explained that grazing practices had changed for the 2023 grazing season in that cattle are only permitted to graze in the southern portion of the Allotment (which includes Wills Canyon, the location of the known NMMJM population) from April to June, and they are moved to the northern portion of the Allotment from July to October. *Id.* Lastly, Respondents stated that

because one of the Incidental Take Statement triggers was met during the 2021 grazing season, the Forest Service reinitiated consultation with FWS, and it expects to produce a new BiOp regarding grazing on the Allotment within the next few months.  *Id.*  After the hearing, Respondents filed a Notice of Projected Completion Date for Superseding Biological Opinion which stated that the new BiOp will be issued on or before December 31, 2023.  *Doc. 42.*

III.   ANALYSIS

Petitioners bring claims against Respondents for violations of the APA as well as Sections 7 and 9 of the ESA, *see doc. 1* at 41-45, and request two remedies: (1) remand and vacatur of the 2021 BiOp, and (2) an injunction preventing any grazing from occurring on the Allotment until a legally compliant BiOp is in place, *doc. 23* at 58-61. Based on the reasons given below, including that a new BiOp is about to be issued which will supersede the 2021 BiOp and moot all claims related to the 2021 BiOp as well as other factual circumstances in the case, I find that neither remedy would have any real-world effect.  As a result, I recommend that Petitioners' claims be denied as moot.

A.  **The Issuance of a New BiOp Will Moot Any Claims Related to the Validity of the 2021 BiOp**

The new BiOp issued by FWS on or before December 31, 2023, *see doc. 42*, will moot Petitioners' claims regarding the validity of the 2021 BiOp.  *See Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1111 (10th Cir. 2010); *see also Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1123 (9th Cir. 1997).  In *Rio Grande*, the 10th

Circuit held that the issuance of a 2003 BiOp[4] which assessed the impact of a water

project on the Rio Grande Silvery Minnow mooted the petitioners' claims related to the

2001 and 2002 BiOps on the same water project because the issuance of the 2003 BiOp

meant that the 2001 and 2002 BiOps no longer existed.  601 F.3d at 1111.  The court also

implicitly held that the new BiOp was not an example of a voluntary cessation of

conduct which does not deprive a federal court of jurisdiction under mootness doctrine,

*see Ne. Florida Chapter of Assoc. Gen. Conts. of Am. v. City of Jacksonville*, 508 U.S. 656, 662

(1993), because the 2003 BiOp "establishe[d] a new regulatory framework under which

the propriety of [the government's] actions must be judged," and because the 2003 BiOp

was meaningfully different from the 2001 and 2002 BiOps.  *Rio Grande*, 601 F.3d at 1111

(noting that the petitioners could not argue that 2003 BiOp was "a mirror image" of

prior BiOps nor were the changes "only superficial").

Similarly, the forthcoming BiOp issued by FWS in the instant case will create a

new regulatory framework for the protection of the NMMJM in the Allotment.  First,

Respondents state in their notice to the Court that the new BiOp will supersede the 2021

BiOp indicating that the new BiOp will be a replacement regulatory framework for

grazing and the protection of the NMMJM in the Allotment.  *Doc. 42* at 1.  In addition,

real-world conditions at the Allotment have materially changed since the 2021 BiOp

was issued because the Forest Service has installed significantly more permanent

---

[4] BiOp is abbreviated as B.O. in *Rio Grande*.  601 F.3d at 1106.

fencing in and around the areas where the NMMJM are believed to exist. *Doc. 43* at 2.

Because the new BiOp will need to account for these real-world circumstances as well

as the overgrazing which triggered the ITS and led to the need for re-consultation, the

forthcoming BiOp will include substantive regulatory changes and will not be a "mirror

image" of the previous BiOp. *Rio Grande*, 601 F.3d at 1111. As a result, the new BiOp

will supersede the 2021 BiOp, and Petitioners' claims under the APA and Section 7 of

the ESA regarding the validity of the 2021 BiOp will be mooted.

## B. Although a New BiOp Has Not Yet Been Issued, Ongoing Circumstances Render a Decision on Petitioners' Claims as Prudentially Moot

The doctrine of prudential mootness instructs a court to decline to grant

declaratory or injunctive relief when "circumstances [have] changed since the beginning

of litigation that forestall any occasion for meaningful relief," even if the claims are not

constitutionally moot. *Southern Utah Wilderness All. v. Smith*, 110 F.3d 724, 727 (10th Cir.

1997). Prudential mootness is generally applied "in cases involving requests for

prospective equitable relief by declaratory judgment or injunction," *Fletcher v. United

States*, 116 F.3d 1315, 1321 (10th Cir. 1997), "where it appears that a defendant, usually

the government, has already changed or is in the process of changing its policies or

where it appears that any repeat of the actions in question is otherwise highly unlikely."

*Bldg. and Constr. Dept. v. Rockwell Intern. Corp.*, 7 F.3d 1487, 1492 (10th Cir. 1993) (citation

omitted). Indeed, the doctrine applies when the controversy is so "attenuated that

considerations of prudence and comity for coordinate branches of government counsel

the court to stay its hand, and to withhold relief it has the power to grant." *Id.* at 1491-92 (quoting *Chamber of Com. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980).

Given the imminence of the new BiOp as well as ongoing circumstances on the ground, I recommend that the Court find that Petitioners' claims related to the validity of the 2021 BiOp are prudentially moot. I acknowledge that the new BiOp has not yet been formally issued by FWS. However, the new BiOp will be issued within the next two months which, as discussed, will constitutionally moot Petitioners' claims. A ruling on the merits of the soon-to-be-obsolete 2021 BiOp will have no real-world effect and provide Petitioners with no relief because the remedy for an invalid BiOp is for the agency to re-initiate consultation and issue a new BiOp, the precise steps that the agencies are already taking. Rather, a ruling on the merits of the 2021 BiOp would expend unnecessary judicial resources and would risk stepping on the toes of the executive branch after it has already indicated that it "is in the process of changing its policies" by issuing a new BiOp. *Rockwell Intern. Corp.*, 7 F.3d at 1492.

Further, real-world conditions at the Allotment have mooted Petitioners' strongest argument challenging the validity of the 2021 BiOp meaning that Petitioners would be unlikely to prevail if the Court were to rule on the merits of the 2021 BiOp. Petitioners raised four main arguments challenging the 2021 BiOp including: (1) the BiOp did not consider the interim effects of grazing on the mice before the conservation measures mandated by the action were implemented; (2) the BiOp did not consider the

impact of the action on the recovery prospects of the mice; (3) the BiOp's no adverse

modification determination is invalid; and (4) the BiOp's Incidental Take Statement is

invalid.  *See generally doc. 23*.  Without making any formal recommendations regarding

the validity of the BiOp, my review of the 2021 BiOp revealed that the Forest Service

and FWS made meaningful infrastructure and regulatory changes, such as building

more permanent fencing and conducting more checks of fenced areas for illegal

grazing, that would protect and expand NMMJM habitat.  AR 5441.  These habitat

protections would in turn contribute to the improvement of the species' health.  The

2021 BiOp's biggest flaw is that even though it acknowledged that the NMMJM were in

a relatively dire state in 2021, it does not make any findings regarding how the mice

would be protected in the two-year interim period between when the BiOp was issued

and the conservation measures were implemented (Petitioners' first argument).

However, at this time, the conservation measures have been implemented, *doc. 43* at 2,

and Petitioners' interim effects argument is moot.

   During the hearing on Petitioners' Opening Merits Brief, Petitioners argued that

the Court should not rely on the doctrine of prudential mootness to deny Petitioners'

claims regarding the 2021 BiOp because a ruling on the merits would provide guidance

to the Forest Service and FWS regarding future BiOps.  *Doc. 43* at 3.  There are two

problems with this premise.  First, Respondents have already determined that the 2021

BiOp is inadequate, and they are in the midst of undergoing the remedy prescribed by

the governing statutes and regulations, namely re-consultation and issuance of a new

BiOp.  The Tenth Circuit has specifically cautioned the judiciary against ruling on the

merits when the judicial remedy would merely be a substitute for a remedy by another

branch.  *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1210 (10th Cir. 2012)

("[O]nce the plaintiff has a remedial promise from a coordinate branch in hand, we will

generally decline to add the promise of a judicial remedy to the heap.").  In *Winzler*, the

plaintiff asked the court to provide a judicial remedy for a defective car part even after

the defendant car manufacturer had voluntarily recalled the part in accordance with

National Highway Transportation Safety Administration regulations.  *Id.* at 1209.

Similar to Petitioners in the instant case who want the Court to provide FWS with

guidance for the new BiOp, the *Winzler* plaintiff argued that a remedy from the judicial

branch "would give her a firmer whip hand to ensure [the defendant] fulfill[ed] its

recall duties."  *Id.* at 1214.  The *Winzler* court rejected the plaintiff's contention and held

that principles of comity prevent the judicial branch from enforcing its own remedy

when the executive branch's remedy will produce "equally effective results."  *Id.*  If it

becomes apparent that "the remedial mechanisms selected by a coordinate branch

aren't just different," but will "fail to achieve [the] stated objectives," the court must

"proceed with the case."  *Id*. at 1214-15.  Until that point, however, the judicial branch

must allow the entities of the coordinate branch, in this case FWS and the Forest Service,

the opportunity to implement their own remedy—re-consultation and a new BiOp.

18

Second, the Court should not rule on the 2021 BiOp in an effort to provide guidance to FWS for future BiOps because the real-world conditions in the Allotment are substantially different than they were when the 2021 BiOp was first issued.  As noted, the Forest Service has since installed several new permanent fences throughout the Allotment which will have significant import on the jeopardy analysis of the NMMJM.  *Doc. 43* at 2.  The Forest Service has also implemented new grazing practices. *Id*.  When FWS prepares the new BiOp, it will have access to environmental and grazing data from the 2021-2023 grazing seasons and it will theoretically incorporate these data as well as the updated real-world conditions into the regulatory scheme contained in the new BiOp.  If the Court were to rule on the merits of the 2021 BiOp, it would be ruling on an outdated regulatory scheme and making findings based on environmental and regulatory conditions that likely no longer exist.  Even if it were proper at this point for the Court to provide guidance to FWS and the Forest Service about how to design the new BiOp, it is unclear how useful this guidance would be.  Instead, the Court can wait to review the regulatory scheme proposed by the agencies until it has been updated to account for new real-world conditions (assuming Petitioners challenge the validity of the new BiOp).

Petitioners also argued during the hearing that the Court should not find their claims regarding the validity of the 2021 BiOp as moot because Petitioners' claims fall under the "capable of repetition by evading review" exception to the mootness

doctrine. *Doc. 43* at 2. Petitioners argue that they have challenged the same issues in previous BiOps and have not received a resolution from the court for over five years. *Id.* First, I note that Petitioners voluntarily dismissed their 2020 lawsuit regarding the 2017 BiOp after FWS agreed to accelerate the issuance of the 2021 BiOp. *See* Joint Motion to Dismiss Case and to Approve Settlement Agreement, *Ctr. for Biological Diversity v. Christiansen et al.*, No. 1:20-cv-00863-WJ-JFR, *doc. 27* (D.N.M. Mar. 29, 2021). Second, the Ninth Circuit dealt with a similar issue in *Idaho Department of Fish & Game v. National Marine Fisheries Service* and found that because the superseding BiOp would be in effect for four years, the litigants had "more than enough time . . . to obtain judicial review." 56 F.3d 1071, 1075 (9th Cir. 1995). Given that the 2021 BiOp was set to be in effect for approximately eight years, *see* AR 5350, it is likely that the new BiOp will also be in effect for several years which will give Petitioners the opportunity to challenge the new BiOp and obtain judicial review. In fact, Respondents agreed to accelerate the issuance of the new BiOp from April 2024 to December 31, 2023, in order to give Petitioners additional time to seek judicial review before the start of the 2024 grazing season. *Doc. 43* at 2; *doc. 42*.

I also recommend that the Court deny Petitioners' request for an injunction on all grazing on the basis of prudential mootness because an injunction, like a remand order, would have no real-world effect. *S. Utah Wilderness All.*, 110 F.3d at 728 (denying as prudentially moot the plaintiff's request to enjoin the government's actions until it

engaged in consultation because consultation had already occurred and an injunction would provide only a "speculative benefit").  During the hearing, counsel for Respondents explained that grazing has not occurred in the portion of the Allotment where the NMMJM are located since the beginning of July, and no grazing has occurred in any part of the Allotment since the 2023 grazing season ended on October 31, 2023. *Doc. 43* at 2.  Grazing will not begin again until the start of the 2024 grazing season on May 15, 2024, after Respondents have issued the new BiOp.  As a result, there is no active, ongoing threat to the mice in the area.  *Compare Ctr. for Biological Diversity v. Ross*, 419 F.Supp.3d 16, 23 (D.D.C. 2019) (holding that because ongoing lobster fishing was causing the endangered North Atlantic right whale to suffer "unprecedented fatalities," an injunction in the interim period before the government issued a new BiOp "would undoubtedly have some effect in the real world").  Indeed, an injunction on grazing in the Allotment will change nothing—grazing will still not occur between now and next May and FWS will still issue the new BiOp by the end of the year.  *See Great Divide Wind Farm 2 LLC v. Aguilar*, No. 19-2214, 2021 WL 2690477, at *2 (10th Cir. Mar. 30, 2021) (unpublished) (holding that "a request for an injunction is moot if there is no reasonable likelihood that the requested injunction would result in any changes").

Petitioners argue that an injunction is warranted because Respondents' prior repeated violations of their obligations to protect the NMMJM as well as the severe decline in NMMJM population health mean it is reasonably certain that a future injury

will occur, even under a new BiOp.  *Doc. 43* at 3; *doc. 23* at 59.  The likelihood that prior injuries will be repeated in the future is a factor in considering whether the request for a remedy is prudentially moot.  *Jordan v. Sosa*, 654 F.3d 1012, 1024 ("Where a plaintiff seeks an injunction, his susceptibility to *continuing* injury is of particular importance."); *Winzler*, 681 F.3d at 1211-12 ("If the party seeking relief can show that there exists some cognizable danger of recurrent violation . . . we will continue with the case even in the face of a simultaneous remedial commitment from another branch.") (citation omitted). The fact remains, however, that the particular circumstances of this case prevent the Court from providing any relief because the main remedy for a faulty BiOp (the issuance of a new BiOp) is already underway, and an injunction would not prevent any harm because there is no ongoing grazing.  However, unlike other kinds of cases in which a mootness ruling may be the end of the road for the plaintiffs' claims, Petitioners will have the opportunity to challenge the new BiOp in a new lawsuit as soon as it is issued if they feel that a renewed challenge is warranted.

## IV.   Conclusion

Based on the foregoing reasons, I RECOMMEND that the Court DENY AS

MOOT Petitioners' challenge to the 2021 BiOp and request for an injunction and

DISMISS Petitioners' Complaint (*doc. 1*).

_____
GREGORY B. WORMUTH
CHIEF UNITED STATES MAGISTRATE JUDGE

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**